COMMONWEALTH OF KENTUCKY,
DEPARTMENT OF HUMAN
RESOURCES, Petitioner,

v.

Raymond J. DONOVAN, Secretary of
Labor, et al., Respondents.

No. 81–3140.

United States Court of Appeals,
Sixth Circuit.

Argued June 22, 1982.

Decided April 5, 1983.

Ryan M. Holloran, Asst. General Counsel, Com. of Ky., Dept. for Human Resources (argued), Frankfort, Ky., for petitioner.

Dwight Preston, Hardin County Atty., Elizabethtown, Ky., Donald J. Skeeters, David T. Gray, Skeeters & Bennett, R. Terry Bennett (argued), Radcliff, Ky., for Vine Grove.

Marcia C. Baugh, Elizabethtown, Ky., for Jerry Jones.

David E. Jones, Atlanta, Ga., Nathaniel Baccus, III, Jonathan H. Waxman, Neilda C. Lee, William DuRoss (argued), U.S. Dept. of Labor, Washington, D.C., for respondents.

Before KEITH and JONES, Circuit Judges, and ALLEN,* District Judge.

NATHANIEL R. JONES, Circuit Judge.

The Commonwealth of Kentucky petitions[1] this Court to set aside a decision of the Secretary of Labor that Jerry Jones, an employee of Vine Grove, Kentucky under the Comprehensive Employment and Training Act of 1973 (CETA), was wrongfully terminated and entitled to back pay.[2] The

`*` The Honorable Charles M. Allen, Chief United States District Judge, Western District of Kentucky, sitting by designation.

1. The Commonwealth petitions this Court pursuant to 29 U.S.C. § 817(a) which provides that:

(a) If any prime sponsor is dissatisfied with the Secretary's final action with respect to the disapproval of its comprehensive employment and training plan under section 814 of this title, or if any recipient is dissatisfied with the Secretary's final action with respect to a sanction under section 816 of this title, such prime sponsor, recipient, or person may, within 60 days after notice of such action, file with the United States court of appeals for the circuit in which the prime sponsor, recipient, or person resides or transacts business a petition for review of such action.

The petition was filed within sixty days of the notice of back pay award.

2. The decision of the Secretary is, in part, pursuant to 29 U.S.C. § 816. Subsection (b) of that section provides that the Secretary shall investigate alleged improprieties in the operation of CETA:

(b) Whenever the Secretary receives a complaint from any interested person or organization (which has exhausted the prime sponsor's grievance system under subsection (a)(1) of this section or which has exhausted or failed to achieve resolution of the grievance under the recipient's grievance system under subsection (a)(2) of this section or under a collective bargaining agreement within the time limits prescribed in subsection (a)(1) of this section or in such agreement) which alleges, or whenever the Secretary has reason to believe (because of an audit, report, on-site review, or otherwise) that a recipient

of financial assistance under this chapter is failing to comply with the requirements of this chapter, the regulations under this chapter, or the terms of the comprehensive employment and training plan, the Secretary shall investigate the matter. The Secretary shall conduct such investigation, and make the final determination required by the following sentence regarding the truth of the allegation or belief involved, not later than 120 days after receiving the complaint. If, after such investigation, the Secretary determines that there is substantial evidence to support such allegation or belief that such a recipient is failing to comply with such requirements, the Secretary shall, after due notice and opportunity for a hearing to such recipient, determine whether such allegation or belief is true.

Subsection (f) provides:

(f) if the Secretary determines that any recipient under this chapter has—

(1) discharged or in any other manner discriminated against a participant or against any person in connection with the administration of the program involved or against any person because such person has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding or investigation under or related to this chapter, or otherwise lawfully denied to any person a benefit to which that person is entitled under the provisions of this chapter or the Secretary's regulations, or

(2) discriminated against any person, failed to serve equitably significant segments of the eligible population, or failed to provide employment or training opportunities at levels of skill and remuneration that are commensurate with the participant's capabilities or potential capabilities;

Commonwealth contends that the back pay award against it must fail for three reasons: (1) the Commonwealth was not the employer who wrongfully terminated Jones and thus not, as held by the Secretary, liable for any restitution to him; (2) even if the Commonwealth is liable for the wrongful discharge, it contends that back pay is not an appropriate remedy in this case; and (3) the award of back pay to be paid from non-CETA funds is alleged to be a violation of the Tenth Amendment.

Since we find no merit in the Commonwealth's contentions, we affirm the Secretary's order and award.

## I.

The Commonwealth is a prime sponsor under the CETA program, pursuant to 29 U.S.C. § 801, *et seq.,* receiving a federal grant for the maintenance of an employment and training program. The purpose of the program is to provide job training and employment opportunities for the economically disadvantaged, unemployed and underemployed so that they can become self-sufficient and gain the maximum employment opportunities available. 29 U.S.C. § 801.[3]

In its capacity as prime sponsor, the Commonwealth must, *inter alia,* maintain and supervise a program for funneling the federal funds to those who need it.[4] The program envisions the use of subgrantees, like Hardin County, Kentucky, who place or employ the ultimate beneficiaries of the grant.

Jerry Jones was hired under the CETA program by Hardin County and placed in the City of Vine Grove's public works department. He began work on July 23, 1976 and was classified as a "Laborer II." That position required him to perform various construction and maintenance tasks, though it did not require that he operate any machinery requiring a driver's license.[5] Jones

the Secretary shall, within 30 days, take such action or order such corrective measures, as necessary, with respect to the recipient or the aggrieved person, or both.

3. In pertinent part, 29 U.S.C. § 801 states:
*Congressional statement of purpose.* It is the purpose of this chapter to provide job training and employment opportunities for economically disadvantaged, unemployed, or underemployed persons which will result in an increase in their earned income, and to assure that training and other services lead to maximum employment opportunities and enhance self-sufficiency by establishing a flexible, coordinated, and decentralized system of Federal, State and local programs. It is further the purpose of this chapter to provide for the maximum feasible coordination of plans, programs, and activities under this chapter with economic development, community development, and related activities, such as vocational education, vocational rehabilitation, public assistance, self-employment training, and social service programs.

4. The supervision and maintenance provisions, discussed below at p. 9, provide, inter alia, that the state, as the prime sponsor, must develop, approve and supervise operation of its subgrantees and contractors, 29 C.F.R. § 98.27(d), must assure the Secretary that it will supervise the program, 29 U.S.C. § 815(a)(1)(B) (1973) and must provide for dispute resolution between subgrantees and participants, 29 C.F.R. § 98.26.

5. The Administrative Law Judge noted that the Laborer II job classification did not specify the precise work assignments that the participant would perform. Rather, it appears to be a general classification where the supervisor of the labor "may entrust him with work requiring greater skill if the participant had the potential therefor." The ALJ also noted that Jones was hired as a laborer, who performed a variety of tasks, and not as a light equipment operator [which would have required a driver's license]. This conclusion was based upon the following reasoning:
The backhoe is the only piece of self-moving equipment which the participant is shown to have operated. That does not, however, make the participant, as the Commonwealth in its post-hearing report suggests, a light equipment operator. The job description for this job (Att'mt to Commonwealth Post-Hrg Rept) defines the tasks to be performed by its holder as operating under supervision "light automotive and power equipment", and doing other work as required. On the other hand, the laborer performs "a variety of general labor tasks" as the participant here did. The job description specifies the many kinds of motorized equipment which a light equipment operator must be capable of operating. A backhoe is not even among those specifically mentioned and at no time did the participant on the record here operate the kinds of equipment specifically mentioned.
Clearly, he was not *de facto* a light equipment operator but a laborer who had learned

did operate a back hoe on occasion, as part of his duties.

The ALJ found, and the record shows, that Jones was a good worker and had no problem in performing the variety of tasks assigned him.[6] There is some evidence in the record to the effect that he had a problem with drinking, but the problem does not seem to have had any effect on his work performance. That is, until he lost his driver's license.

It is not clear from the record exactly when Jones lost his license. The documentary evidence shows that his license was suspended on August 9, 1978, well after he was terminated by Hardin County on June 30. Yet, Jones's own testimony was to the effect that he had not had a driver's license for approximately six months prior to losing his job.

On June 30, 1978, Vine Grove terminated Jones's employment for poor work performance. The county, through its agent, approved the termination. Yet, shortly thereafter, the county reversed itself, on July 26, 1978, ordering Vine Grove to reinstate Jones. The change in position came after an informal hearing on July 20, held by the Kentucky Department of Human Resources. The Department had determined that there was insufficient cause for the dismissal.[7]

Jones was never reinstated[8] but, upon returning to the jobsite, was told that there was no work for him. Presumably this was because he had lost his driver's license and could no longer operate the back hoe. The city evidently did not even consider finding Jones work at the jobsite which did not require a driver's license.

Upon notification by the city that Jones had been terminated, the Department of Human Resources attempted to find other work for Jones. Ultimately, the DHR found a job in Radcliff, Kentucky, some eight miles from Vine Grove. A DHR employee took Jones to the plant to interview for the job and he was eager to accept work. Yet, because he had neither a car nor a license, he could not get to and from work. There were no reasonable alternative means of transportation.

Even though the Radcliff job fell through by no fault of his own, Jones was terminated from the CETA program by Hardin County on July 31, 1978. The reason noted

---

to use a single piece of motorized ditch-digging equipment and was allowed to operate it. Nor did the participant receive any promotion to this higher job or a wage increase because he operated the backhoe. Had this in fact occurred it would surely have been shown.

Hence, the participant did not hold a light equipment operator job and was not required to possess a valid driver's license as a condition of employment for the job which he actually held (Compare Att'mt to Commonwealth Post-Hrg Rept with Jones Ex. 1). (Appendix 10–11.)

**6.** There is some suggestion that Jones gave his foreman difficulty, but the Department of Labor ALJ noted that there was no direct evidence offered to that effect. The foreman was not asked to testify, nor was his absence explained.

**7.** The ALJ found that:

The new mayor elected in the fall of 1977 disliked the participant, considered him no good, thought he had been on CETA too long and wanted him off the public payroll. No misconduct at work is shown and, while unsatisfactory work performance is charged against the participant, it is totally unproven. Indeed, the testimony of the new mayor about the participant's conduct related to the participant's private life of which the mayor disapproved and such conduct did not affect the adequacy of the participant's work for the City.

[Appendix at 18.] We see no reason, on the record before us, to doubt the ALJ's finding on this point.

**8.** There is some dispute as to whether Jones was discharged once or twice. The two-discharge theory would be that Jones was reinstated for several days in July and then discharged when work could not be found for him. The ALJ rejected this view, even though Jones was on the payroll for four days at the end of July. The ALJ reasoned, "I consider it correct to view the chain of events as a single discharge action originally resisted by DHR but ultimately erroneously acquiesced in." We find no reason to disturb this determination.

on the form was that he had found his own job.[9]

Jones appealed his termination to the Commonwealth's DHR as prime sponsor. At this second hearing by the Department, it upheld the termination. The Department held that since Jones had accepted another job in Radcliff, even though he could not get to and from it, he was not entitled to continue in the CETA program.

This decision was appealed, pursuant to 29 C.F.R. § 98.40,[10] to a grant officer in the Department of Labor. The grant officer reversed the decision of the DHR, holding that Jones should have been retained in the CETA program at the jobsite in Vine Grove because he could not find adequate transportation to the Radcliff job. The grant officer ordered reinstatement and back pay to be awarded from non-CETA funds.

The Commonwealth requested a hearing before an Administrative Law Judge (ALJ) to review the grant officer's decision and award. The ALJ held a hearing on July 17, 1980, at which he heard testimony and received documentary evidence. His decision upheld the grant officer's award against the Commonwealth. He found that Jones had not been discharged for cause and that the Commonwealth had failed to fulfill its obligation under the CETA program to find another job for Jones. At a minimum, the DHR should have attempted to have Jones reinstated at the Vine Grove jobsite in a capacity that did not require a driver's license.

Finally, the ALJ found that the award of back pay against the Commonwealth, even though it was Vine Grove who wrongfully dismissed Jones, was proper. The prime sponsor, the ALJ noted, is responsible for seeking reimbursement from Vine Grove if the city is indeed at fault.

Pursuant to 29 U.S.C. § 817, the Commonwealth petitioned this Court to reverse the order granting back pay. It is this petition that is now before us.

## II.

The Commonwealth contends that the Secretary's order should be reversed because it was based upon the belief that the Commonwealth either was, in part, directly responsible for the improper termination of Jones from CETA, or that it can be held liable for the admittedly improper actions of Vine Grove. The Commonwealth's position is that it did all that it could to keep Jones in the CETA program and that it cannot be held accountable for the Vine Grove discharge. The proper remedy, it urges, is against Vine Grove.

The Secretary determined that Kentucky did not do all that it could have done. In fact, the ALJ noted that the Commonwealth did not even attempt to enforce its own order which called for Jones's reinstatement. Moreover, the Commonwealth did little to find either additional work under the program or to rectify the Vine Grove error. Finally the ALJ noted that the Commonwealth, as prime sponsor, cannot hide behind a lack of contractual or state law obligation to supervise the subgrantees. Instead, the supervisory responsibility derives from the CETA program itself. We agree.

In reviewing the Secretary's decision, the scope of our review should be made clear. CETA specifically provides that we must uphold the Secretary's factual conclusions if they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 817(b).[11]

---

9. We presume that the report erroneously indicated why Jones was terminated so the action would not appear improper. It is clear that Jones could not have been terminated because he did not accept a job to which there was no reasonably available transportation. *See National Geographic Society v. UCB*, 438 F.2d 154 (D.C.Cir.1970) [unemployment insurance case where dearth of reasonably available transportation made refusal of job permissible].

10. Unless otherwise noted, all references to regulations are those in effect at the time of dismissal, i.e., 29 C.F.R. § 94, *et seq.* (1978).

11. 29 U.S.C. § 817(b) provides:
 (b) The findings of fact by the Secretary if supported by substantial evidence, shall be conclusive, but the court, for good cause shown, may, in whole or in part, set aside the findings of the Secretary or remand the case

### A. The Commonwealth of Kentucky's Liability.

The Department of Labor ALJ premised the Commonwealth's liability on two notions. First, he held that the Commonwealth had failed to carry out its own duty to supervise the CETA program by overseeing and resolving problems with its subgrantees. Second, the ALJ noted that the Commonwealth is responsible, as prime sponsor, for the malfeasance of its subgrantees under CETA. Carefully noting that the Commonwealth has mechanisms under CETA to collect the amount of the judgment from the subgrantees, the ALJ awarded the back pay against the Commonwealth.

■ The Commonwealth's argument that it has no contractual or state law power to supervise the subgrantees is simply inapposite.[12] The power and duty to supervise stems directly from the CETA program. That program's enabling statute, 29 U.S.C. § 801, *et seq.*, and the regulations that have been promulgated thereunder, 29 C.F.R. Part 94, *et seq.*, make clear that the prime sponsor is not a mere funnel for money to pass from the federal government to the grantees and ultimate employers. The structure of the program, as well as the obligations imposed upon the prime sponsor, are such that the prime sponsor is, in large part, given the major responsibility to ensure that the program runs effectively and according to law. The prime sponsor is clearly given the duty of supervision and the powers to carry the task to completion.

The prime sponsorship program appears to have developed in an effort to give as much local control over the particular programs consistent with guaranteeing that the purpose of the Act would not be frustrated by fragmentation. The prime sponsor is given the task of coordinating grants within the geographic boundaries it controls. It is also given the responsibility of overseeing the operation of the program. Thus, 29 C.F.R. § 98.26 requires that the prime sponsor establish procedures to resolve disputes and grievances that arise under the program. Section 98.27(d) provides that a grantee under the Act, which includes prime sponsors under § 94.4(z), is responsible for the "development, approval and *operation* of all contracts and subgrants and shall require that its contractors and subgrantees adhere to the requirements of the Act, regulations promulgated under the act and other applicable law" (emphasis added).

The organic statute provides that the Secretary of Labor shall not approve a grant to a prime sponsor unless there is a filed comprehensive plan that sets forth, among other things, "assurances that such services will be administered by or under the supervision of the prime sponsor." 29 U.S.C. § 815(a)(1)(B) (1973). The amendments to the Act made clear that the program structure incorporated the prime sponsor as a supervisor for the program in its geographic area. Section 816(d)(1) provides that the Secretary of Labor can take corrective action against the prime sponsor when it fails to adequately ensure that the subgrantees and contractors are carrying out the purpose and the letter of the Act.

It is without doubt, then, that the Commonwealth, as prime sponsor, cannot merely claim that the wrongful discharge was not of its own doing to avoid liability. The

---

to the Secretary in whole or in part to take further evidence, and the Secretary may thereupon make new or modified findings of fact and may modify the previous action, and shall certify to the court the record of the further proceedings.

12. Aside from the argument, which we will address below, that the Commonwealth is not contractually or legally bound by federal law to liability for the acts of the employer, Vine Grove, the Commonwealth states "one need look no farther than the Kentucky Constitution and the facts of this case to refute the conclusion that Kentucky had control over Vine Grove." Brief at 9.

The Commonwealth's arguments must fail because we *necessarily* must look beyond the Kentucky Constitution. In voluntarily entering into the CETA program, the Commonwealth agreed to be part of a federal scheme that imposes liability over and grants some level of control over Vine Grove. The CETA program is a federal scheme and, as such, takes its contours from federal law.

CETA program is a two-way street. The prime sponsor receives funds to distribute in its geographic area, but must also accept the supervisory role envisioned by the Act. It cannot passively sit by while the subgrantees and contractors violate the Act and regulations. It must police and enforce those regulations and ensure that the program within its geographic area runs smoothly and according to law. Though we do not see the need to set out the full scope of the prime sponsor's liability, it does include providing for resolution of disputes between participants and subgrantees; enforcing the orders it issues with respect to those disputes, and ensuring that a CETA employee is not wrongfully terminated from the program.

 The ALJ found that the Commonwealth failed to carry out its duty in this regard. We believe that this finding is supported by substantial evidence in the record. While it is true that the DHR had initially ordered reinstatement at the July 20, 1978 meeting, it did not enforce that order. In addition, the DHR made only one attempt to place Jones, at Radcliff, a job to which he could not find transportation. It did not attempt to find work at the Vine Grove jobsite where Jones had previously worked. There was, no doubt, work that he could perform without his driver's license. These facts led the ALJ to find that the Commonwealth was, in part, responsible for the termination. He reasoned that, by failing to enforce its original order finding the termination unjustified, the Commonwealth acquiesced in the termination.

### B. The Back Pay Award.

Our determination that the Department of Labor was correct in holding that the Commonwealth, as a prime sponsor, could be held liable for acquiescing in a wrongful termination by one of its subgrantees does not end the inquiry. The Commonwealth further contends that even if it is liable, the back pay award is without authority. It urges that we reverse the award.

 The problem concerning back pay in CETA cases arising before October, 1978

has plagued several courts. *See City of Great Falls v. Department of Labor,* 673 F.2d 1065 (9th Cir.1982); *Commonwealth of Massachusetts v. Department of Labor,* 683 F.2d 568 (1st Cir.1982). It is beyond doubt that the 1978 amendments to the CETA program provide the Secretary with the power to award back pay against the prime sponsor. 20 C.F.R. § 676.91(c) (1980) provides:

(c) *Contents of decision.* The decision of the Administrative Law Judge shall state the factual and legal bases for the decision and shall state the relief to be ordered. The Administrative Law Judge shall have the full authority of the Secretary in ordering relief, including direct action against the subrecipients as authorized by section 106(d) of the Act. *Orders for relief may provide for suspension or termination of, or refusal to grant or continue federal financial assistance in whole or in part, and may contain such terms, corrective action, conditions, sanctions (including awards of back pay), reallocations, and other provisions as are consistent with and will effectuate the purposes of the Act and regulations issued thereunder,* including provisions designed to insure that no federal financial assistance will therafter [sic] be extended under such program unless and until the prime sponsor, recipient or subrecipient corrects its noncompliance and makes satisfactory assurance that it will fully comply with the Act and regulations.

Several Circuits have recognized this power when there is a wrongful dismissal and the complaint is not merely a procedural one. *City of Great Falls v. U.S. Department of Labor,* 673 F.2d 1065 (9th Cir.1982); *Commonwealth of Massachusetts v. Department of Labor,* 683 F.2d 568 (1st Cir.1982); *County of Monroe v. Dept. of Labor,* 690 F.2d 1359 (11th Cir.1982); *Milwaukee County v. Peters,* 682 F.2d 609 (7th Cir.1982). While it is clear that the post-1978 amendments to CETA expressly provide for back pay awards in situations such as this one, there is some dispute as to whether the Secretary had the authority to award back pay prior to those enactments. We think that he did.

The Commonwealth argues that we should not retroactively apply the 1978 amendments to the case at hand. The Ninth Circuit has taken such a position in *City of Great Falls v. Department of Labor,* 673 F.2d 1065 (9th Cir.1982). There, the Court was faced with a situation where the Department had awarded back pay to a participant who had been deprived of proper procedures for what was an otherwise proper termination. The Court assessed whether the 1978 provisions should be applied retroactively and decided that they should not. In making that determination, the Court held that to do so would subject:

> CETA participants to new, unanticipated liability for non-compliance with the regulations. The Secretary did not promulgate regulations expressly authorizing back pay awards as a sanction for non-compliance until after the 1978 amendments.

On the strength of that reasoning, the Court held that back pay was not an available remedy prior to the 1978 amendments. We cannot agree.

The source of our disagreement is twofold. First, we do not believe, as the Ninth Circuit seems to, that the question here is one of retroactivity. In fact, the Department of Labor relies solely on pre-1978 enactments and regulations to support its contention that it has the power to award back pay. Thus, while we feel that the 1978 amendments are probative as to what the intentions of Congress were prior to 1978, we do not feel that the retroactivity issue is essential here. Second, we do not agree with the contention that the 1978 amendments were a radical and "unanticipated" change in the program. Rather, in our view, the 1978 amendment noted above merely clarified what had been the prior practice.[13]

The Seventh Circuit has noted that the 1978 provision expressly providing for back pay awards against the prime sponsor "cannot have been wholly unanticipated." *Milwaukee County v. Peters, supra,* 682 F.2d at 612. In fact, the award of back pay finds support in the earlier regulations as interpreted by the Department of Labor. 29 C.F.R. § 98.48(f) (1978) provides:

> (f) *Content of orders. The final decision* may provide for suspension or termination of, or refusal to grant or continue Federal financial assistance, in whole or in part, under the program involved in accordance with the Act, and *may contain such terms, conditions, and other provi-*

---

13. A close examination of the regulation promulgated prior to 1978 and the amendment in 1978 make clear that the change was merely one of making more detailed what had been included in the earlier, more general, terminology. The earlier regulation provided that a Department of Labor order:

> may contain such terms, conditions, and other provisions as are consistent with and will effectuate the purposes of the Act and the regulations issued thereunder.

29 C.F.R. § 98.48(f) (1978). The post-1978 wording, in pertinent part, is that the Department of Labor orders may:

> contain such terms, corrective action, conditions, sanctions (including back pay), reallocations and other provisions as are consistent with and will effectuate the purposes of the Act and regulations issued thereunder.

29 C.F.R. § 98.48(f) (1980).

Referring to the changes imposed, after 1978, to the regulations concerning complaint resolution [which included the changes to § 98.-48(f)], the Department stated:

> The regulations have been edited to make them easier to understand. In addition, the complaint procedure at the prime sponsor level has been revised to clearly set forth the separate grievance procedure required by section 106(a)(2) of the Act. The Department believes that a certain amount of detail is needed to assure basic due process to complainants, and to assure that prime sponsor procedures produce an adequate record that is sufficient for review when the complaint gets to the Federal level. Under the former regulations which were basically the same in substance but were sparing in detail, some prime sponsors had inadequate complaint systems which resulted in a failure to ensure basic due process and adequate records.

44 F.R. 19994 (April 3, 1979).

It is noteworthy that the Department makes no mention of any change or major shift in policy with regard to the types of remedy permissible in Department of Labor orders. While the Department does not explicitly state that it is *not* modifying the existing rule, the tenor of the changes and the lack of any indication that there is a shift in remedial policy convinces us that the 1978 rule changes were merely ones of detail, not substance.

*sions as are consistent with and will effectuate the purposes of the Act and regulations issued thereunder,* including provisions designed to assure that no federal financial assistance will thereafter be extended under such program to the respondent determined by such decision to be in default in its performance of an assurance given pursuant to the Act or regulations issued thereunder, or to have otherwise failed to comply with the Act or regulations thereunder, *unless or until it corrects its non-compliance, and satisfies the Secretary that it will fully comply with the Act and regulations issued thereunder.* 29 C.F.R. § 98.48(f) (emphasis added).

Though not expressly providing for back pay, the Department of Labor has interpreted this provision, prior to the 1978 amendments, to include the power to award back pay. *In the Matter of San Diego and Regional Employment and Training Consortium Termination of Randall McFadden and H.J. Parker,* 78–CETA–107 (June 29, 1978). This enduring department policy was again referred to in *In the Matter of James v. Town of Middleborough,* 79–CETA–174 (January 28, 1980). In *Middleborough,* the Department was faced with the issue as to whether to apply the 1978 amendments or the old § 98.48(f). It found that it had the power under either provision to grant back pay awards.

This view is supported by the realization that back pay, in many circumstances, will further the purposes of the Act. An award of back pay is the traditional "make whole" remedy for wrongful discharge. *See Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) [under the NLRA]; *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) [under the 1964 Civil Rights Act, Title VII]; and *Mitchell v. Robert DeMario Jewelry,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) [under the FLSA]. Where it has not furthered the purposes of CETA, as when the discharge is proper but the procedure is technically deficient, courts have been reluctant to allow such a remedy. *City of Boston v. Secretary of Labor,* 631 F.2d 156 (1st Cir.1980) [when termination is for cause, but technically deficient, back pay is disfavored as remedy]; *City of Great Falls v. Department of Labor,* 673 F.2d 1065 (9th Cir.1982) [technical violation not remediable by back pay award by retroactive application of the 1978 regulations]; *County of Monroe, Florida v. United States Department of Labor,* 690 F.2d 1359 (11th Cir.1982) [if termination was substantively correct, but technically deficient, back pay not appropriate]. The rationale for disallowing back pay in these cases is that it does not further the purposes of the CETA program.

Yet, in cases not involving technical defects, like this one, no court has found that back pay awards are inconsistent with the purpose of the Act. *Commonwealth of Mass. v. Department of Labor,* 683 F.2d 568 (1st Cir.1982) [court rejects the argument that back pay awards are inconsistent with the purpose of CETA]; *City of Boston v. Secretary of Labor,* 631 F.2d 156, 159 (1st Cir.1980).

In sum, we believe that the Department's position, even prior to the enactment of the 1978 amendments, is that back pay awards are a proper remedy when the circumstances require. That Department policy is, we believe, consistent with and in accordance with the purposes of the CETA program. As such, we should give deference to the Department's interpretation of the Act and its regulations promulgated thereunder. *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971); *Brennan v. Owensboro-Daviess County Hospital,* 523 F.2d 1013, 1028 n. 13 (6th Cir.1975); *Brennan v. City Shores, Inc.,* 479 F.2d 235 (5th Cir.1973).

Since we believe that the pre-1978 enactments and regulations permitted back pay awards to be granted in situations such as these, we do not need to reach the retroactivity issue that the Ninth Circuit addressed in *City of Great Falls.* To the degree that we find the pre-1978 scheme authorized back pay awards, we reject the Ninth Circuit's holding in that case.

Moreover, we cannot accept the Commonwealth's argument that to allow a back pay award in this case is to apply the 1978 amendments retroactively. The 1978 amendments, in our view, merely codified the specific remedy that had been employed by the Department of Labor under the general terms of the old statute and regulations. We find that the 1978 amendments support the Department's contention that their *prior* interpretation of the CETA provisions was consistent with the purposes of the Act and Congressional intent.[14]

One issue remains with respect to the propriety of the back pay award. The ALJ found that the City of Vine Grove had wrongfully discharged the CETA employee and that the Commonwealth, by acquiescing, was only partially responsible. Yet, he awarded back pay against the Commonwealth. The Commonwealth contends that even if it is liable for failing to remedy the wrongful discharge, the proper back pay award is against the city.

At the outset, it should be noted that the ALJ specifically stated that the Commonwealth could seek reimbursement from the city. In addition, the CETA scheme affords the prime sponsor mechanisms to seek redress from the subgrantees and contractors. Thus, the ultimate issue is whether it was improper to have the prime sponsor, rather than the aggrieved employee, seek reimbursement from the city. We find no error, when, as here, the prime sponsor is in part responsible for the wrongful termination from the CETA program. This is especially so when the city has shown its reluctance to follow previous orders and the Commonwealth has failed to enforce them.

In *Milwaukee County v. Peters,* 682 F.2d 609, 613 (7th Cir.1982), the Court addressed just this issue. In that case, the county prime sponsor argued that it should not be held accountable for back pay since it was not responsible for the wrongful discharge. The discharge in that case occurred, as here, prior to the 1978 amendments. The Court

noted that, among other provisions, 29 C.F.R. § 98.27(d) obligates the prime sponsor to oversee and take responsibility for the contractors and subgrantees. As the Court put it, "the overall scheme of the CETA program is that the Department of Labor will deal primarily with its grantees, and grantees will have the responsibility for further ramifications [sic] of the program." *Id.* at 612. Furthermore, "grantees have considerable autonomy in the local administration of CETA programs; the federal government is entitled to exact a corresponding accountability." *Id.* at 613. Finally, the Court noted that the ALJ's decision to hold the county accountable for the back pay award was supported by the fact that the county had originally found the claimant entitled to the back pay, but had not enforced that ruling. As the Court put it, "In the face of demonstrated recalcitrance, the ALJ was justified in taking positive steps to insure that Ms. Peters did not end up with an uncollectible judgment." *Id.* at 613 n. 10.

Similarly, the First Circuit approved of a back pay award against the prime sponsor to remedy a subgrantee's wrongful acts in *Commonwealth of Massachusetts v. Department of Labor,* 683 F.2d 568 (1st Cir.1982). Though under the new provisions, the reasoning is applicable here. The Court wrote:

Eckles is entitled to his back pay award, and this case had dragged on long enough over a relatively small sum. The Commonwealth appears to be in a position to make the payment, and it can no doubt work out the ultimate payment with Yarmouth. Eckles should not have to wait for the Commonwealth-Yarmouth relationship to be resolved.

*Id.* at 571.

We find no error in granting the back pay award against the Commonwealth of Kentucky as prime sponsor. The Commonwealth was, in part, responsible for the wrongful termination. There is evidence that a previous order granting Jones reinstatement went unheeded by the city and unenforced by the Commonwealth. There

14. See footnote 13, *ante.*

is no reason, given the hierarchy of responsibility created by the CETA program, that Jones should not be paid by the Commonwealth who then can work out the appropriate formula for payment with the city. To hold otherwise would put an unnecessary burden on an already wronged CETA participant.

### III

■ Finally, the Commonwealth argues that the back pay award, even if appropriate under the CETA provisions, cannot be ordered against a state out of non-CETA funds. This, it contends, would be tantamount to a federal "raid upon the state treasury" in violation of the Tenth Amendment. To support that proposition, the Commonwealth relies upon the Supreme Court's decision in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

The Tenth Amendment provides that: The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

To uphold the award of back pay as consistent with the Tenth Amendment, we must find an enumerated power which gives the government authority to make such orders part of a statutory scheme. The government contends that it has such power under the Spending Clause. We agree.

The Spending Clause gives to Congress the "Power to lay and collect taxes ... to provide for the ... general welfare of the United States." Art. I, § 8, cl. 1. Congress not only has the power to spend for the general welfare, it can impose conditions on the receipt of those federal funds. *Oklahoma v. United States Civil Service Commission,* 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947); *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Steward Machine Company v. Davis,* 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); *Oklahoma v. Schweicker,* 655 F.2d 401 (D.C.Cir.1981); *County of Los Angeles v. Marshall,* 631 F.2d

767 (D.C.Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 113, 66 L.Ed.2d 44 (1980); *New Hampshire Department of Employment Security v. Marshall,* 616 F.2d 240 (1st Cir.1980); *Florida v. Mathews,* 526 F.2d 319 (5th Cir. 1976); *Arizona Department of Public Welfare v. Department of Health, Education and Welfare,* 449 F.2d 456 (9th Cir.1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972).

■ Moreover, it is clear that Congress can regulate, through the inducement of federal programs and conditions upon receipt of money under them, areas that it does not have the regulatory power to affect directly. *See Oklahoma v. United States Civil Service Commission,* 330 U.S. at 143, 67 S.Ct. at 553; *Oklahoma v. Schweicker, supra; State of New Hampshire v. Marshall,* 616 F.2d 240 (1st Cir.1980), *appeal dismissed,* 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10 (1981); *County of Los Angeles v. Marshall,* 631 F.2d 767 (D.C.Cir.1980), *cert. denied,* 449 U.S. 837, 101 S.Ct. 113, 66 L.Ed.2d 44 (1980); *Florida v. Mathews,* 526 F.2d 319 (5th Cir.1976); *Texas Landowners Rights Association v. Harris,* 453 F.Supp. 1025 (D.C.D.C.1978).

The rationale, made clear in *Pennhurst State Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), is that the state voluntarily accepts the conditions imposed by Congress and thus is, in essence, contracting to be regulated in exchange for the benefit.

We must, then, reject the Commonwealth's insistence that *National League of Cities v. Usery, supra,* dictates that we invalidate the back pay award. *National League of Cities* explicitly involved limitations upon the mandatory regulations Congress imposes under its Commerce Clause power. First, the Court specifically limited its holding to the Commerce Clause:

We express no view as to whether different results might obtain if Congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such as the spending power,

Art. 1, § 8, cl. i, or § 5 of the Fourteenth Amendment.

426 U.S. at 852, n. 17, 96 S.Ct. at 2474, n. 17. *See also, City of Rome v. United States,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) ["The decision in *National League of Cities* was based solely on an assessment of congressional power under the Commerce Clause."] [15]

Second, the kind of regulations found unacceptable in *National League of Cities* were *mandatory* regulations that "force directly upon the States [Congress's] choices as to how essential decisions regarding the conduct of integral governmental functions are to be made." 426 U.S. at 855, 96 S.Ct. at 2475.[16] Here, as in the typical spending power case, the states are not forced to accept the congressional restrictions im-

posed. Rather, they are free to accept the CETA grants and the concomitant regulations and liability, or forego the federal funding and remain free of regulation.

The Secretary's 1978 regulations make clear that the states receive CETA grants laden with conditions and liability. They require that a prime sponsor, in its preapplication for funding, give assurances that the program will be run in accordance with the Act and the Secretary's regulations. 29 C.F.R. § 95.11. Similarly, the application must contain an assurance that the prime sponsor will comply with "the Act and regulations, including conformance to amendments." 29 C.F.R. § 95.14(b)(3). Thus, the state voluntarily accepts the Secretary's power to alter the program and require compliance.[17] Furthermore, the Act and

---

**15.** The courts have refused to extend the *National League of Cities* rationale to the spending power. *Oklahoma v. Schweicker,* 655 F.2d 401, 412 (D.C.Cir.1981); *State of New Hampshire v. Marshall,* 616 F.2d 240, 247 (1st Cir. 1980), *appeal dismissed,* 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10; *County of Los Angeles v. Marshall,* 631 F.2d 767, 769 (D.C.Cir.1980), *cert. denied,* 449 U.S. 837, 101 S.Ct. 113, 66 L.Ed.2d 44 (1980); *Florida Department of Health v. Califano,* 449 F.Supp. 274, *aff'd. mem.,* 585 F.2d 150 (5th Cir.1978), *cert. denied,* 441 U.S. 931, 99 S.Ct. 2051, 60 L.Ed.2d 659 (1979); *Usery v. Charleston City School District,* 558 F.2d 1169 (4th Cir.1977); *Usery v. Allegheny County Institutional District,* 544 F.2d 148 (3rd Cir.1976), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977).

**16.** Many courts have recognized that Congress may induce by the "carrot" of federal grants what it cannot coerce states to do. *State of New Hampshire v. Marshall,* 616 F.2d 240, 245 (1st Cir.1980), *appeal dismissed,* 449 U.S. 806, 101 S.Ct. 53, 66 L.Ed.2d 10 (1981) [attack on the unemployment compensation program; the court noted that, unlike the FLSA in *National League of Cities,* the "basic premise and scheme of the [program here], are based on the concept that a state is free to accept conditions by conforming to federal statutory requirement or can refuse to participate entirely"]; *County of Los Angeles v. Marshall,* 631 F.2d 767, 769 (D.C.Cir.1980), *cert. denied,* 449 U.S. 837, 101 S.Ct. 113, 66 L.Ed.2d 44 (1980) ["The voluntary and wholly optional aspect of that scheme persists in full measure under the 1976 amendments, and serves to defeat the contentions advanced by appellants of coercion and improper transgression upon the sovereignty of the states shielded by the Tenth Amendment;"

challenge to the Federal Unemployment Tax Act.]; *Florida v. Mathews,* 526 F.2d 319, 326 (5th Cir.1976) ["The only effect of the statute is to induce, but not require, a state to license its nursing home administrators . . . . This inducement does not infringe upon any power reserved to the state under the Tenth Amendment . . . . Once a state chooses to participate in a federally funded program, it must comply with federal standards."]; *Texas Landowners Rights Association v. Harris,* 453 F.Supp. 1025 (D.C.1978) [The program is a "carrot and stick scheme . . . which offers certain inducements for state participation, rather than one which, along the lines of the Fair Labor Standards Act amendments in *National League of Cities,* mandates compliance with a discretion-less federal enactment."]

**17.** We do not contend that, because the Secretary of Labor has broad power to change the regulations and the states have accepted money subject to § 95.14(b)(3), the Secretary has unlimited power to intrude upon the state's operations or treasury. The Supreme Court noted in *Pennhurst State School v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1980), the Secretary will be bound by fair notions of contract law. The Secretary cannot so alter the program as to fundamentally change the basic agreement.

In this case, we find no problem with this issue. The Commonwealth clearly accepted liability for its subgrantees' actions. Back pay awards are not so inconsistent with the purpose of the Act, or the fundamental thrust of the CETA scheme, that to interpret § 98.48(f) as allowing such awards is a change in the basic agreement.

We do not read *Pennhurst,* which involved the issue as to whether a particular grant of

regulations contain a series of obligations imposed upon the states. They must restrict the participants' activities, 29 C.F.R. § 98.23; provide certain benefits, 29 C.F.R. § 98.24; establish and maintain a dispute resolution procedure, 29 C.F.R. § 98.26; provide books and reports to allow the Secretary to review the program's operation, 29 C.F.R. § 98.18; and subject themselves to hearings and judgments of the Secretary, 29 C.F.R. § 98.40, *et seq.*

The state, in joining the CETA program, opens itself up to possible federal intrusion into the state treasury, even if due only to the malfeasance of the subgrantees. 29 C.F.R. § 98.15 grants the Secretary the power to diminish funding to the prime sponsor in cases where there has been a spending of funds in violation of the Act or regulations. The state cannot, in that situation, decrease the level of funding for the program. 29 C.F.R. § 98.15(b). Thus, it must subsidize the program out of its own treasury.

In short, the CETA scheme clearly places conditions upon the states that voluntarily receive funds under the program. They must accept liability for their subgrantees' actions and, if the Secretary so determines, may be required to pay restitution for improprieties in the administration of the program. One form of restitution authorized by the scheme is the back pay award. The Commonwealth cannot reap the benefits of the CETA program without incurring the liabilities it imposes. The voluntary nature of the program ensures that the back pay awards are consistent with the Tenth Amendment.

Therefore, the Secretary was within his statutory and constitutional authority in awarding back pay against the Commonwealth of Kentucky as prime sponsor. His order should be enforced. It is so ORDERED.

funds was conditional at all, to require Congress to expressly provide for each and every detail of a spending program. To do so would obliterate Congress's power to use agencies to carry out and develop policy under a general scheme or statutory design. Rather, *Pennhurst,* may require that when an agency fills in

the specifics of a program, as the Secretary did here with respect to remedy, that it not be so unanticipated and detached from the original design as to constitute a change in the fundamental scheme. Here, there is no such problem.