Alice M. **FITZGERALD,** Appellant,

v.

Lorenzo C. **FITZGERALD,** Appellee.

No. 87–1259.

District of Columbia Court of Appeals.

Argued Jan. 4, 1989.
Decided Oct. 13, 1989.

---

E. Marie Wilson–Lindsay, Washington, D.C., with whom Joyce A. Wilson was on the brief, for appellant.

Ronald K. Henry, Washington, D.C., with whom Kathryn A. Ellis, Seattle, Wash. was on the brief, for amicus curiae National Council for Children's Rights and Greater Washington Area Chapter, Women's Div. of the Nat. Bar Ass'n.

Thomas W. Kavanagh, Columbia, Md., for appellee.

Charles L. Reischel, Deputy Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., were on the brief, for amicus curiae District of Columbia.

Sandra Lord, with whom Cathy A. Simon and Mary Helen Carlson, Washington, D.C. were on the brief, for amici curiae the Women's Legal Defense Fund, Children's Defense Fund, D.C. Chapter of the Nat. Organization for Women, D.C. Com'n for Women, D.C. Rape Crisis Center, Family and Child Services, Fred Taylor (Executive Director, For Love of Children), the Women and the Law Clinic of the American University's Washington College of Law, Women's Bar Ass'n of the District of Columbia, Diane M. Brenneman, and Catherine Woods.

Before ROGERS, Chief Judge, and TERRY and STEADMAN, Associate Judges.

ROGERS, Chief Judge:

The provision of adequate child support surely ranks high among the priorities of a civilized nation. Congress has acted in recognition of the need to assure appropriate action by the states and the District of Columbia. Among the required actions is the establishment of child support guidelines. In this appeal the principal issue is whether the Superior Court of the District of Columbia had the authority to establish the Child Support Guideline,[1] and if so, to what extent the Guideline can be validly applied. Upon review of the relevant legislation, the Guideline and the Report of the Superior Court Child Support Guideline Committee, and other materials in the record, we conclude that the Superior Court had the authority to promulgate a Guideline as a Superior Court rule consistent with existing law. Because the Guideline established by the Superior Court conflicts with existing law, however, we hold that it is invalid. With respect to the appeal of the custody order, we find no abuse of discretion by the trial judge in granting *pendente lite* custody of the parties' minor child to the father in order to maintain the status quo pending entry of a final custody order.

---

1. The District of Columbia Superior Court Child Support Guideline appears as Appendix I to the General Rules of the Family Division of the Superior Court, 2 D.C.Court Rules Ann. 19 (1988) (Guideline). It also appears in 115 Daily Wash.L.Rptr. 1 (October 27, 1987).

## I.

## STATEMENT OF FACTS

This litigation commenced when appellant Alice M. Fitzgerald sued appellee Lorenzo C. Fitzgerald for divorce, child custody and support of their nine year old daughter, and a division of property. The husband filed a counterclaim seeking the same relief for himself, including "reasonable child support." The wife also sought custody and *pendente lite* child support. An evidentiary hearing established that the wife is a newly practicing medical doctor with a gross annual income of $120,000 and over $200,000 of educational debts and annual medical malpractice premiums of $30,-000. The husband is a police officer with a law degree and a gross annual income of $30,344. Their daughter, born in 1978, has lived almost since birth with the husband's father and step-mother while the parents pursued their educational and professional advancement. The husband testified that the minimum monthly needs of his daughter were $724.00, and that he only paid approximately one-third of those costs.

The trial judge *pendente lite* awarded temporary custody of the child to the husband and ordered the wife to make temporary child support payments to the husband of $1,316 a month. In making the determination of child support, the trial judge followed the then recently established Child Support Guideline.[2] The wife appeals, challenging the custody determination and the child support order and the validity and application of the Guideline. The amici address only the general validity of the Guideline.

## II.

## CHILD CUSTODY

The trial court ordered, *pendente lite*, that custody of the child would be granted to the husband. In effect, this preserved the status quo, whereby the child would continue living with the husband's father and stepmother. This arrangement had been entered into when the child was about a year old, to accommodate the educational and professional commitments of the parents.

■ Trial court determinations of child custody are subject to reversal only for clear abuse of discretion. *Plumley v. Plumley*, 465 A.2d 393, 394 (D.C.1983); *Moore v. Moore*, 391 A.2d 762, 770 (D.C. 1978). This is particularly the case where, as here, the order under review is *pendente lite*, and where the continuance of the status quo does not conflict with the best interests of the child. *Cf. Bazemore v. Davis*, 394 A.2d 1377, 1380–83 (D.C.1978) (eliminating legal presumption that it is in the best interest of the child to be placed with mother). Here, the trial judge applied the custody criteria set forth in D.C.Code § 16–911(a)(5) (1989 Repl.) and in applicable case law. *See, e.g., Albergottie v. James*, 470 A.2d 266, 271–72 (D.C.1983); *Moore v. Moore, supra*, 391 A.2d at 770–71 (D.C. 1978); *Rutledge v. Harris*, 263 A.2d 256, 257–58 (D.C.1970). The judge, *inter. alia*, found that the child had a close relationship with her father in an "appropriate, warm loving arrangement"; the father's "direct love has been expressed on a frequent and daily basis"; "her adjustment at the present time is really excellent"; she "is a secure child because of the arrangement she has"; and that she is well taken care of and currently comfortable.

■ The wife argues that in effect custody has been awarded to the grandparents rather than to the husband, and that she therefore is entitled to custody unless shown to be unfit, citing *Bazemore v. Davis, supra*. We think this is a misconception of *Bazemore*, as well as the family situation. The trial judge found that in fact the husband visited the child on a daily basis and made decisions that are imposed upon the custodial parent. Especially in

**2.** The trial judge's initial "Pendente Lite Custody, Support, and Visitation Order" was signed on October 31, 1987, *nunc pro tunc* to October 8, 1987. On appeal this court remanded for further explanation of the trial judge's basis for utilizing different income figures in determining the amount of child support to be paid by the wife under the Guideline. The judge entered a further explanatory order on December 9, 1987.

the context of review of a *pendente lite* order, we find no abuse of discretion here.

## III.

## CHILD SUPPORT GUIDELINE

The other major issue in this appeal, which has attracted the interest of three amici curiae,[3] is the validity and application of the Guideline to child support determinations. Under pre-existing law, child support awards were based on the child's documented expenses and the parents' net incomes, while under the Guideline there is a presumptive formula based exclusively on gross income. In substance, the disagreement is over the proper interpretation of the congressional statute authorizing adoption of such guideline. The relevant language is:

> In any case ... involving the establishment or enforcement of child support ... the hearing commissioner shall conduct a hearing on support, make findings, and enter judgment *as provided by law,* and in accordance with guidelines established *by rule of the Superior Court,* which judgment shall constitute a final order of the Superior Court.

D.C.Code § 11–1732(j)(4)(A) (1989 Repl.) (emphasis added). The fundamental issue is whether, and the degree to which, Congress intended to empower the D.C. Superior Court to affect pre-existing law relating to child support determinations through establishment of the Guideline.

Recognizing that the "primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used," we construe the language in the context of the entire legislative scheme. *Peoples Drug Stores v. District of Columbia,* 470 A.2d 751 (D.C.1983) (en banc) (citations omitted). D.C.Code § 11–946 (1989 Repl.) defines the rule-making authority of the Superior Court, and the issue is how the reference to court rule was intended to affect the na-

ture of the child support guidelines that the Superior Court could establish under § 11–1732(j)(4)(A). No legislative history of the cited code section answers directly the question of congressional intent. However, statutory language can derive "meaningful content from the purpose of the Act, its factual background and the statutory context." *Florida Power & Light Co. v. United States,* 269 U.S.App.D.C. 377, 387 n. 9, 846 F.2d 765, 775 n. 9 (1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1952, 104 L.Ed.2d 422 (1989) (quoting *American Power & Light Co. v. SEC,* 329 U.S. 90, 104, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946)). "[O]ur task is to interpret the words of these statutes in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979).

### A. *Introduction*

In 1984 Congress mandated that all states and the District of Columbia adopt child support guidelines as a condition of receiving Aid to Families with Dependent Children funding. 42 U.S.C.A. § 667 (West Supp.1988). Implementing regulations, promulgated in 1985, required that the guidelines "be based on specific descriptive and numeric criteria and result in a computation of the support obligation." 45 C.F.R. § 302.56(c) (Supp. IV 1986). Both the statute and regulations contemplated that the guidelines could be established "by law or by judicial or administrative action." 42 U.S.C. § 667(a). The same law also mandated that each state establish expedited support procedures, 42 U.S.C. § 666(a)(2) (Supp. IV 1986), including hearings in which the presiding officer is not a judge. 45 C.F.R. § 202.101.

In 1986 Congress enacted the District of Columbia Judicial Efficiency and Improvement Act of 1986, Pub.L. No. 99–573 (Oct. 28, 1986), 100 Stat. 3228, to provide, *inter alia,* permanent authority for hearing com-

---

3. We take this opportunity to express our appreciation for their briefs and oral arguments which have significantly contributed to our understanding of the legal issues relating to the Guideline. For ease of reference we refer to amici National Council for Children's Rights and the Greater Area Chapter, Women's Division of the National Bar Association as amici NCCR, and the other amici as WLDF.

missioners in the Superior Court. This Act provided that in matters concerning child support the order of the hearing commissioners would be final orders of the Superior Court and the commissioners would be bound by existing law and guidelines established by rule of the Superior Court. D.C. Code § 11–1732(j)(4)(A) (1989 Repl.).[4] The 1986 Act amended the statute on hearing commissioners which provided for their appointment subject to "the standards and procedures established by rules of the Superior Court," and that "[w]ith the concurrence of the District of Columbia Court of Appeals, the Board of Judges of the Superior Court may promulgate rules, not inconsistent with the terms of this section, which are necessary for the fair and effective utilization of hearing commissioners in the Superior Court." D.C.Code § 11–1732(a) & (n) (1989 Repl.).

The Chief Judge of the Superior Court in 1985 appointed a committee which studied the formulation of appropriate child support guidelines and made recommendations to the Board of Judges which adopted the Child Support Guidelines on September 28, 1987. See note 1, *supra*. The Guideline provides numeric calculations for establishing the needs of the child based on the parents' gross incomes and applies presumptively unless there are extraordinary circumstances sufficient to justify deviation from them.

We examine first the scope of authority which Congress granted either explicitly or implicitly to the Superior Court, acting through the Board of Judges, to establish child support guidelines. We then examine the nature of the Guideline to determine what force it has and whether it is contrary to existing case law.

**B.** *Authority to Issue the Guideline*

**1.** *The Congressional Mandate*

**a.** *Federal Legislation*

 As part of Congress' concern with ensuring that children receive proper support, it passed the Child Support Enforcement Amendments of 1984 (amending 1975 Social Security Act, 42 U.S.C.A. §§ 657–662 (West Supp.1988), conditioning disbursement of Aid to Families with Dependent Children funding on state compliance with increased enforcement procedures. Pub.L. No. 98–378, 98 Stat. 1321–22 (1984). One of the provisions required states to issue child support guidelines. 42 U.S.C.A. § 667 (West. Supp.1988). The legislation did not specify the exact method by which states should adopt the guidelines, only that it be "by law or by judicial or administrative action." *Id.* § 667(a). Thus, the individual states and the District of Columbia[5] would have discretion in choosing the particular mode of formulating their guidelines. Congress further specified that the guidelines should be made available to judges and other officials and, in 1988, added a provision that the guidelines should be presumptive.

> (2) There shall be a rebuttable presumption, in any judicial or administrative proceeding for the award of child support, that the amount of the award which would result from the application of such guidelines is the correct amount of child support to be awarded. A written finding or specific finding on the record that the application of the guideline would be unjust or inappropriate in a particular case, as determined under criteria established by the State, shall be sufficient to rebut the presumption in that case.

Family Support Act of 1988, Pub.L. No. 100–485, § 103(a)(2), 102 Stat. 2346 (1988).[6]

---

**4.** The House Report noted that amendment by Congress of the requirements for the Title IV–D program under the Social Security Act, 42 U.S.C. 666(a)(2)(A), Pub.L. 98–378, 98 Stat. 1306, necessitated modification of the Superior Court hearing commissioner processes so that there could be expedited process for child support where the presiding officer is not a judge. H.R. Rep. No. 99–326, 99th Cong., 1st Sess. 3 (1985). The House Report referred to a bill that did not mention guidelines. *See also* S.Rep. No. 99–477,

99th Cong. 2d Sess. 4 (1986). The amendments also were to answer concerns raised in *Kwakye v. District of Columbia,* 494 A.2d 643 (D.C.1983). *Id.*

**5.** 42 U.S.C. § 1301(a)(1) (1988 Supp.).

**6.** Originally, 42 U.S.C.A. § 667(b) specified that the guidelines "need not be binding upon such judges or other officials," 98 Stat. 1322, but this

*See also* 45 C.F.R. §§ 302.56 and 303.101. The legislation did not specify the contents of the guidelines or the particular goals to which they should aspire.

The Congressional findings [7] and the legislative history of the Child Support Enforcement Amendments indicate, however, that Congress had a number of concerns. First, the amendments mainly addressed the enforcement of already existing child support awards. Among other provisions were income withholding and liens on property. Second, the amendments contain two other provisions concerning the issuance of support orders, one requiring expedited procedures, 42 U.S.C.A. § 666(a)(2)(A), and the other requiring appointment of a commission to study the operation of the state's child support system, including the advisability of establishing a statewide schedule for setting a dollar amount of child support orders based on such objective standards as the State may choose. 42 U.S.C. § 601, 651; Sec. 15 of Pub.L. No. 98–378. Finally, Congress was concerned, as indicated in the Reports accompanying both the House and Senate versions of the bill, about the "unrealistic" amounts of child support awards. S.Rep. No. 98–387, 98th Cong., 2d Sess. at 40, *reprinted in* 1984 U.S.Code Cong. & Admin.News 2397. The Senate Report explaining the guideline requirement recognized that guidelines might increase the substantive amount of awards based on the experience in states which had established guidelines. *Id.* It also expressed the view that guidelines would "assure that there is reasonable consideration given both to the needs of the child and the ability of the absent parent to pay." *Id.* Finally, the Committee recognized that

the development of a court order is a complex determination requiring the consideration of many aspects of the individual circumstances of the parties involved, and that there may be a need for courts to have the flexibility to exercise discretion. For this reason, the amendment leaves to each State the decision as to

how these guidelines are to be considered. It is the view of the Committee, however, that the very existence of a set of guidelines in each State will tend to improve the reasonableness and equity with which support orders are established.

*Id.* It, therefore, contemplated that guidelines would be fair in their particulars as well as promote equity through uniformity.

The original House version of the bill did not have a provision for guidelines; however, in explaining its requirement that state commissions study the advisability of establishing statewide objective standards for setting awards, the House Report noted the seemingly arbitrary nature of awards which it believed contributed to noncompliance. Both parties could complain that the award was too low or too high.

Several studies have found that the economic position of non-custodial parents actually improves after divorce while that of the custodial parent and children declines substantially in terms of what their income could provide in relation to their needs even when child support is paid.... Similarly, studies have found that the amounts of support obligation established by courts or administrative tribunals bear little relation to obligors' ability to pay and generally represent a lower percentage of obligors' income the higher that income is.

H.R.Rep. No. 98–527, 98th Cong., 1st Sess. 49 (1983). Without guidelines, children's needs and parents' ability to pay might actually matter less than other irrelevant circumstances.

In jurisdictions where there are no objective guides for establishing support obligations, amounts established in virtually identical cases may vary widely depending on a variety of factors including the particular judge setting the amount and the relative sophistication of legal advice that may be available to each spouse.

*Id.* In such a state of seeming arbitrariness, non-custodial parents might be in-

language was struck in Pub.L. No. 100–485, § 103(a)(2), 102 Stat. 2346.

7. Pub.L. No. 98–378, § 23.

clined to disregard the support order as unreasonable. Having objective criteria would increase the reasonableness and predictability of awards which would lead to greater compliance.

The Committee believes that establishment of realistic support obligations would make a major difference in parents' willingness to pay support and that such realistice [sic] obligation can be obtained through the use of objective standards to guide all parties involved in the support decision—parent, attorneys, judges and administrative officers.

*Id.* Like the Senate, the House recognized that the provisions contained in any guidelines might change the amount of individual support orders but welcomed such change. However, the House, Senate, and Conference Committee never expressed an intention to upset existing state case law.

### b. *District of Columbia Law*

Pursuant to its legislative authority over the District of Columbia, U.S. Const. Art. I § 8, cl. 17; D.C.Code §§ 1–201(a), 1–206 (1988 Supp.), Congress passed the "District of Columbia Judicial Efficiency and Improvement Act of 1986," *supra* (codified at D.C.Code § 11–1732 (1989 Repl.)). Congress made hearing commissioners a more permanent part of the D.C. court system and empowered them to hear cases involving child support and to issue final orders. *See* D.C.Code § 11–1732(j)(4)(A), quoted *supra.* These orders are appealable initially to the Superior Court. *Id.* § 11–1732(k). *See* 45 C.F.R. § 301.101 (1987).

The original version of the bill, however, made no mention of guidelines; requiring only that "the hearing commissioner shall conduct a hearing on support, make findings, and enter judgment." [8] H.R.Rep. No. 99–326, 99th Cong., 1st Sess. 13 (1985). It sought to conform with 42 U.S.C.A. § 666(a)(2)(A), which required "procedures under which expedited processes (determined in accordance with regulations of the Secretary) are in effect for obtaining and enforcing support orders." *Id.* at 3. The granting of permanent authority to hearing commissioners only helped expedite orders; the original bill did not purport to comply with the 42 U.S.C.A. § 667 guidelines requirement. Thus, the main purpose of this bill was to expedite child support cases through establishment of a supplementary procedure outside the slow processes of the regular judiciary.[9]

The final version of the legislation enacted by Congress containing the provision which requires guidelines specifies that the guidelines would be established "by rule of the Superior Court" and be binding on hearing commissioners.[10] D.C.Code § 11–1732(j)(4)(A). It does not specify their substantive contents, and there is no indication whatever that Congress disagreed with established case law or wanted certain changes to be made in developing calculations. On the contrary, the section specifies that the hearing commissioners would have to "enter judgment as provided by law" as well as in accordance with the guidelines established by court rule.

---

**8.** D.C.Law 6–166, the "District of Columbia Child Support Enforcement Amendment Act of 1985," passed by the Council of the District of Columbia the same month as the congressional Act, likewise made no mention of guidelines. *See* 33 D.C.Reg. 6086 (1984) (Act 6–212); Report of the District of Columbia Superior Court Child Support Guidelines Committee 2 (1988) (Guideline Report). The omission in the D.C.Council's legislation, which was designed to strengthen child support enforcement and bring the District of Columbia into compliance with the Child Support Enforcement Amendments of 1984, Pub.L. No. 98–378, *see* D.C.Council Judiciary Committee Report on Bill 6–134, the District of Columbia Child Support Enforcement Amendment Act of 1985, December 4, 1985, at 3, was requested by the Advisory Commission es-

tablished pursuant to the 1984 Amendments to the Child Support Enforcement Act. See note 13, *infra.*

**9.** H.R.Rep. No. 99–326, 99th Cong., 1st Sess. at 3; S.Rep. No. 99–477, 99th Cong., 2d Sess. 4.

**10.** Although the statute is silent on whether the Guideline would be binding on Superior Court judges in reviewing the hearing commissioners' orders, it is consistent with the statutory scheme that Superior Court judges would use the same criteria as hearing commissioners since the statute provides that hearing commissioners' orders are to constitute final orders of the Superior Court. *See* D.C.Code § 11–1732(j)(4)(A); Super. Ct.Gen.Fam.R. D(e)(1). See also note 6, *supra.*

The statutory scheme indicates that Congress sought to promote fairness in the District of Columbia by providing resolution of child support conflicts on an expedited basis through an intermediate tier of hearing commissioners who have ready formulae for calculating support orders. *See, e.g.,* D.C.Code §§ 16–924(a), (f), 30–506(a) (1981, 1988 Repl.). In addition, Congress thought that the uniformity of awards would contribute to their overall fairness and encourage settlements through their predictability.[11] It authorized the Superior Court to achieve these goals by greater use of hearing commissioners and child support guidelines established by court "rule," a term Congress had previously used in connection with the functions of the hearing commissioners and defined at the time it created the Superior Court of the District of Columbia.[12]

The Report of the Superior Court Child Support Guideline Committee (Guideline Report) described the state of child support in the District of Columbia as a "crisis," and indicated that Congress intended to confront this "crisis" directly, suggesting that Congress intended any guidelines to alter the status quo. Guideline Report at 9–10. We find no basis on which to conclude, however, that Congress granted the Superior Court authority to change the substantive law regarding child support awards. To assure higher awards and uniformity of awards did not necessarily require a new approach in the then-existing substantive child support law, but if it did, as the Child Support Guideline Committee concluded, then a legislative remedy was required.

The Child Support Guideline Committee recognized that it was acting in a "quasi-legislative" capacity, but justified its action by stating that the legislature was silent on this particular issue, *i.e.,* specific substantive standards for child support, and that since establishing child support guidelines has traditionally been the province of the judiciary, it would have authority to make significant changes, overturning existing case law whenever necessary. Guideline Report at 9–10. While formulation of support guidelines in the absence of legislation has been the province of the judiciary, the District of Columbia Court of Appeals has been the final arbiter of the substantive District of Columbia child support law. *See* D.C.Code §§ 11–102 & 11–721 (1989 Repl.); *Ferreira v. D.C. Dep't of Empl. Services,* 531 A.2d 651, 600 & n. 9 (D.C. 1987); *Gillis v. United States,* 400 A.2d 311, 313 (D.C.1979). To the extent that the Superior Court Board of Judges sought to overturn existing case law as developed by this court, it was granted no such power by Congress. The Child Support Guideline Committee (and the Board of Judges) cannot expand its authority on the basis of legislation which is silent regarding the authority to overrule existing case law. From the fact that Congress had authorized guidelines to be established by Superior Court rule, it would be an extraordinary reading of Congressional intent to conclude that Congress thereby authorized the Superior Court to act as the District's legislature, with powers otherwise delegated by Congress to the Council of the District of Columbia.[13] *See* District of Colum-

11. The recommendations to Congress by the national Advisory Panel on Child Support Guidelines suggest that Congress intended three improvements over the existing method of determining child support: 1) a higher level in support orders, 2) greater fairness through uniformity, and 3) improved efficiency (including expediting cases and encouraging settlements). Development of Guidelines for Child Support Orders: Advisory Panel Recommendations and Final Report II–2 (1987) ("Panel Recommendations"). This interpretation sheds little light on actual Congressional intent, however, since the report was issued after the 1984 Amendments were enacted. In November 1983, the House Ways and Means Committee requested the U.S.

Office of Child Support Enforcement to establish this panel and produce a project report. Panel Recommendations at I–3.

12. *See* D.C.Code § 11–946 (1989 Repl.) (rule-making power of the D.C.Superior Court); District of Columbia Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, § 111, 84 Stat. 487 (1970).

13. That the D.C.Council did not include a child support guideline in its enactment in 1986 to carry out the 1984 Congressional program to expedite child support proceedings and improve enforcement, see D.C. Child Support Enforcement Act of 1985, note 8, *supra,* provides no

bia Self–Government and Governmental Reorganization Act, §§ 302, 404 of Pub.L. No. 93–198 (1973), 1 D.C.Code at 185–86. Nothing in the legislative history suggests Congress had any such intent, and none of the parties or amici has been able to locate such evidence.

That Congress authorized the Board of Judges to promulgate guidelines by rule is fully consistent with the Congressional purpose to require that the District of Columbia, like the states, have child support guidelines. As the Child Support Guideline Committee itself recognized, a guideline could be based on the existing child support case law in the District of Columbia and still conform with the requirements of the federal statute.[14] Construing the reference in § 11–1732(j)(4)(A) to Superior Court rule in its ordinary meaning does not produce absurd results as would justify ignoring its plain meaning. *See Peoples Drug Stores v. District of Columbia, supra,* 470 A.2d at 754 (citations omitted).

While there may be good arguments for promulgating the detailed formulation of child support guidelines by a court rule rather than statute (i.e., flexibility), absent explicit congressional or other legislative mandate, the exercise of such delegated authority is subject to existing law, both statutory and judicial.[15] Congress did not "set out intelligible standards and statements of purpose" defining such a mission for the Board of Judges or the Guidelines Committee. *Cf. United States v. Ruiz–Villanueva,* 680 F.Supp. 1411, 1417 (S.D. Cal.1988) (upholding sentencing guidelines promulgated by the United States Sentencing Commission). Nor do we find persuasive, in the absence of any evidence of legislative intent, the argument that Congress intended only to refer to statutory law when it provided that the hearing commissioners shall make findings and enter judgments "as provided by law." [16] Con-

support for the interpretation by the Child Support Guideline Committee of its authority to act in a quasi-legislative manner. The Council was specifically requested to delete such a provision from its bill by the District of Columbia Advisory Commission on Child Support. See Comments of the District of Columbia Advisory Commission on Child Support on Proposed Child Support Legislation before the Committee of the Judiciary of the Council of the District of Columbia, May 1, 1985. The Advisory Commission informed the D.C.Council that, as contemplated by Congress' delay in the effective date by which states had to have adopted guidelines, October 1987, studies were under way which should be considered before determining what factors should be included in any child support guideline. Further, in the view of the Advisory Commission, the factors in the bill were unnecessary since they were "reasonably similar to the factors currently considered by the court in setting support and which are embodied in case law." The Advisory Commission stated it was prepared to make recommendations for guidelines for the District of Columbia after completing its study. *See also In re C.A.P.,* 356 A.2d 335, 341 (D.C.1976) (quoting *In re J.S.,* 102 Daily Wash.L.Rptr. 1393, 1396 (July 10, 1974) (Ketcham, J.) (substantive issue of parental rights should be subject to legislation rather than rule-making power of judges)).

14. The Child Support Guideline Committee was aware that some jurisdictions had established child support guidelines by state legislation, *see* Virginia Code Ann. § 20–108.1, and of different approaches adopted by the states to address the

problems that the Committee identified, including approaches that were consistent with the District's substantive child support law. *See* Guideline Report at 25, 26, & 28. *See* Maryland child support guidelines.

15. We find nothing in the legislative history to suggest that Congress deemed the District's existing substantive child support law to be incompatible with the development of guidelines to accomplish Congressional purposes in enacting the 1984 amendments to Child Support Enforcement Act and the Family Support Act of 1988. See note 11, *supra.* Nor do we find anything to suggest that Congress did not view the Council of the District of Columbia as the appropriate body to make the policy decisions regarding the factors on which child support guidelines should be based if the existing law was found to be contributing to child support problems in the District of Columbia.

16. Reliance on the reference in 42 U.S.C. § 667(a) to "law" as distinct from "judicial or administrative action," as evidence that Congress only intended to refer to statutes, is misplaced. That provision simply described various ways in which the child support guidelines could be established. This surely was in recognition of the fact that the states have assigned the responsibility for child support enforcement in different ways, some vesting broad authority in state administrative agencies, others having state courts with very broad rule-making authority, and still others leaving such policy decisions to the state legislature.

gress provided in its authorization for the appointment and work of hearing commissioners that the activities of the hearing commissioners would be limited by Superior Court rule, *see* D.C.Code § 11–1732(a) & (n), and there is nothing to suggest that in 1986 Congress intended to change the rule-making authority of the Superior Court as it was defined by Congress in 1970.[17]

### 2. *General Power to Issue Rules*

The problem with characterizing the Guideline as a Superior Court rule, D.C. Code § 11–946, is that such a rule cannot curtail substantive rights.[18] *In re C.A.P.*, 356 A.2d 335 (D.C.1976).[19] *Cf. Meiggs v. Associated Builders, Inc.*, 545 A.2d 631, 635–36 (D.C.1988) (legislature is presumed to know of judicial interpretation of statute). Amici WLDF contends that there is no substantive right to the "unguided and unbridled" discretion of a judge or hearing commissioner, the "inconsistent application of existing case law," the application of any "particular formula," or computation of child support based solely on common law, and that the Guideline was merely "in

aid of a judicial function" and therefore validly promulgated. These characterizations exaggerate the possible substantive right at stake. Amici NCCR responds that

> In the District of Columbia, there is a substantive right to a child support determination based upon the needs of the child and the parent's ability to pay, determined in light of the parent's available net income and determined within the discretion of the judicial officer.

While no matter what the support award, the monies paid would never be in the nature of a basic substantive right, such as a parental right to custody or visitation. However, by any standard, in its impact on existing substantive law the Guideline goes beyond the governance of mere procedure. Amici WLDF acknowledges, as indeed does the Child Support Guideline Committee, that the Guideline does make changes in the substantive law beyond assigning numeric values to preexisting substantive rights.[20]

---

**17.** See note 12, *supra.* Our dissenting colleague, while suggesting a good rationale for what should have happened, ignores the language of the Congressional authorization to the Superior Court that limited it to guidelines that could be established by "rule of the Superior Court," a well-defined term used elsewhere in the same section of the code regarding hearing commissioners. Neither this court nor the Superior Court can ignore the statutory language.

**18.** Amici WLDF advises that courts in some other states have adopted child support guidelines as rules of court.

**19.** *C.A.P.* involved a Superior Court rule creating a procedure, in the absence of legislative standards, for terminating parental rights due to neglect. Previously such rights could only have been terminated by legislatively mandated procedures for adoptions. *Id.* at 345. The "substantive right" in that case was a parental right which this court found rose to the level of a constitutionally protected interest. *Id.* at 343 (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1971)). The court viewed the Superior Court rule as more akin to legislation than procedure, noting that Congress in granting rule-making authority to the Superior Court did not intend to extend the authority to abridge substantive rights through the adoption of procedural rules. *Id.* at 344. In *C.A.P.* the Court also declined to find that the trial court had inherent powers, acting as par-

ens patriae, to terminate parental rights since the legislature had provided a termination procedure in adoption proceedings. *Id.* at 344–45. *Cf. Flemming v. United States*, 546 A.2d 1001 (D.C.1988) (Super.Ct.Crim.R. 23(b) allowing juries of less than twelve persons invalid because contrary to statute).

**20.** Amici NCCR also contends that the process by which the Committee created the Guideline was improper because it was "closed" and devoid of public input. There are no specific procedures the Child Support Guideline Committee must follow as would agencies under D.C.Code §§ 1–1501 to 1–1511 (1981) since neither the Committee nor the Board of Judges, comprised of the Superior Court judges, is an agency under that subchapter. D.C.Code §§ 1–1502(3)–(5). Further, the regulations promulgated by the Secretary of Health and Human Services provide that "public participation" would inhere in the State Commissions which would be representative of the child support systems. 50 Fed.Reg. 19643 (1985); 45 C.F.R. 302.56. They also mandate numeric rather than descriptive formulae. *Id.*

Nevertheless, the closed process lends support to amici NCCR's allegations of general unfairness when a party is unable to rebut the assumptions hidden by the numeric calculations. It also could contribute to a lack of confidence in the guidelines and resulting support orders, a problem which the House Report had stated

## C. *Changes in Substantive Law*

█ One of the hallmarks of existing case law is that the trial judge has broad discretion in framing child support orders. This court has repeatedly stated that there are "no fixed standard," and the court must "weigh the equities" before entering any support decrees. *E.R.B. v. J.H.F.*, 496 A.2d 607, 612 (D.C.1985). Specifically, the trial court has the duty of " 'balancing the many factors surrounding both the pecuniary situation of the [non-custodial parent] and the reasonable needs of the minor children.' " *Smith v. Smith*, 344 A.2d 221, 223 (D.C.1975) (quoting *Hamilton v. Hamilton*, 247 A.2d 421, 422 (D.C.1968)). The trial court also has to make specific findings on net income and financial need. *E.g., Brice v. Brice*, 411 A.2d 340, 345 (D.C.1980); *Benvenuto v. Benvenuto*, 389 A.2d 795, 800 (D.C.1978) (cases cited therein.).

The two specific relevant factors are the non-custodial parent's ability to pay based on net income and the child's needs based on his or her accustomed standard of living.

> [T]he courts in enforcing such obligation must be mindful of the [non-custodial parent]'s well being and must refrain from the imposition of unduly burdensome financial terms.

*Smith, supra*, 344 A.2d at 223 (citations omitted). This determination of ability to pay has been based on net income. "[I]t is essential that in exercising such discretion the trial court first determine the net income (or a reasonable approximation of such)...." *Brice, supra*, 411 A.2d at 344. In *Wright v. Wright*, 386 A.2d 1191 (D.C. 1978), for example, the non-custodial parent had a gross bi-weekly wage of $406.40 but after subtracting state and federal taxes, medical insurance premiums, retirement contributions, garnishment for unpaid support, and automobile payments, he had only a net income of $66.91. Based on this calculation, the court held that the trial judge's order to pay $300 per month in child support amounted to impermissible punishment. *Id.* at 1193, 1195.

The other side of the general formula is to consider the child's reasonable needs, looking to the standard of living to which the child has become accustomed or would have enjoyed had the parents not divorced. "As to support, the best interests of the children must be assessed in the context of the standard of living to which the children have become accustomed." *Cooper v. Cooper*, 472 A.2d 878, 880–81 (D.C.1984) (separation agreement setting the level of child support) (citing *Benvenuto v. Benvenuto, supra*, 389 A.2d at 799 (child support award by the court in a divorce proceeding)).

When the trial court has failed to determine net income or the child's needs, this court has remanded for further findings. *Plumley v. Plumley*, 465 A.2d 393 (D.C. 1983).

Amici WLDF argues that the Guideline retains the broad principles underlying case law of (1) trial court discretion, (2) assessment of needs and ability to pay, (3) consideration of net income, and (4) fairness to both parents. However, there are several real differences between the Guideline and the case law.

First, the ability to pay under the Guideline is calculated using gross income.[21] Amici WLDF argues that the Guideline percentages allow for tax and other expenses and that the Child Support Guideline Committee would have used a higher number had net income been used; how-

---

contributed to past non-compliance. *See* H.R. Rep. No. 98–527, *supra*, at 49. Moreover, there could be a notice problem since the Guideline went into effect before it was published. In view of our disposition we need not decide whether these procedural objections would be sufficient to invalidate the Guideline.

**21.** While upholding the Guideline as involving only a change in "the practice of setting child support awards," one judge of the Superior Court acknowledged that "[t]he Child Support Guideline Committee itself recognized that a rule based on assessment of needs and ability to pay as a function of income rather than a function of assessment of itemized expenditures would alter the application of substantive child support law in the District of Columbia...." *D.C. ex rel. K.K. v. W.R.C.*, 117 Daily Wash L.Rptr. 1373, 1376 (July 5, 1989) (King, R., J.).

ever, there is no record support for this assertion. Furthermore, amici NCCR points out that the Guideline numbers do not specify how much tax is represented. Case law allows net income to be calculated using all "legitimate" deductions. *Moore v. Moore,* 391 A.2d 762, 771 (D.C.1978). The Guideline merely codifies, according to amici WLDF, the "legitimacy" of the particular expenses starting with gross income but ending up with a purportedly fairer estimation of net income. The Child Support Guideline Committee used no such rationale, however. Alternatively, amici WLDF concedes that the Guideline is a departure from existing D.C. law by using gross income but justified as producing more equitable orders.

Second, the Guideline determines a child's needs solely on the parents' income. Amici WLDF argues that studies show no fixed "need"; instead, the needs of a child will vary according to the income level and standard of living of the parents. However, the traditional way of assessing need has been to have the custodial parent to fill out a financial statement setting forth actual and projected expenses. The Child Support Guideline Committee concedes that the Guideline marks a definite departure from current practice of basing child support on the needs of the child and the ability of the parents to pay, but asserts that "such a change was necessary to correct the current problems." Guideline Report at 11–12.

Third, the presumptive nature of the Guideline places some limitation on the breadth of the discretion previously exercised by the trial court. To the extent that it takes on a binding quality or limits the inherent power of the Family Division to weigh the equities in each individual case, then it may constitute an unlawful overruling of prior case law in this jurisdiction. If the Guideline merely offers a suggested manner of apportionment, then much of the stated benefits in uniformity would be lost. As a rebuttable presumption, the Guideline avoids these two pitfalls, but the question remains regarding what level of proof is required to overcome the presumption.

By its own terms, the Guideline is not binding. "The guideline is fashioned to provide guidance, not to replace the discretion of the judicial officer." Guideline, *supra* note 1, at 20. It is also "an evolving document" subject to modification over time. *Id.* The list of four factors justifying deviation from the Guideline states, "*Among* the specific factors which should be considered for overcoming the presumption are the following," *id.* at 27 (emphasis added), suggesting that it is not an exhaustive list. In short, some discretion remains. *See also* Pub.L. No. 100–485, § 103(a)(2), quoted *supra.*

However, the Guideline places certain inherent and explicit restrictions on the discretion of the hearing commissioner and trial judge. As now written, a party opposing application of the Guideline has the burden of showing that he or she has an "exceptional" case or one involving "some circumstances which would yield patently unfair results" which justifies deviation from application of the Guideline. Guideline, *supra* note 1, at 27.[22] How the threshold of rebuttal is phrased and interpreted will substantially impact the restrictiveness of the Guideline. A narrow interpretation of the Guideline would establish a strong presumption that it applies, absent very extraordinary circumstances (e.g., the child is handicapped or one parent lives in a mansion and the other in a hovel). A looser interpretation would allow deviation whenever a case departs from the paradigm on which the Guideline is based. While the Family Support Act of 1988 amending 42 U.S.C.A. § 667 expressly makes the Guideline a legislative presumption, the validity of a presumption

> depends as a general rule upon a rational nexus between the proven facts and the presumed facts.

*United Scenic Artists Local 829 v. NLRB,* 246 U.S.App.D.C. 48, 55, 762 F.2d 1027,

---

**22.** This phraseology does not appear fully consistent with the 1988 amendment to 42 U.S.C.A.

§ 667 set forth in the text *supra* at n. 6.

1034 (1985) (citations omitted). *See also Bazemore v. Davis, supra,* 394 A.2d at 1380–83. Adhering to a presumption in the face of facts to the contrary may constitute an abuse of discretion. *See, e.g., Legille v. Dann,* 178 U.S.App.D.C. 78, 82, 544 F.2d 1, 5 (1976) (presumption of timely delivery by postal service).

Since the Guideline is presumptively fair,[23] any party opposing its application would have a higher burden of proof than it might have without the Guideline. Although mandated by federal regulations, the numeric formulae make it difficult to ascertain what assumptions are being made. Amici NCCR argues that it is impossible to tell the basis on which the Guideline is presumptively applied. The Guideline Report offers no economic basis for the Child Support Guideline Committee's determinations. Consequently, the party trying to argue against application of the Guideline faces a monumental obstacle in attempting to demonstrate a case is "exceptional" without knowing what "unexceptional" is.[24] The existence of the Guideline alone has coercive power through the rigidity of its calculations and the ease of its application. Rather than deciding each case individually, decision-makers may be tempted to plug in numbers that explain themselves without making further findings. These and other considerations will be relevant in drafting any future child support guidelines in light of the 1988 amendment to 42 U.S.C.A. § 667 and this opinion.[25]

The classic cases—the poor woman as custodial parent who has to provide child care herself or pay someone to provide it while she works, and the custodial parent whose standard of living declines as the former spouse's standard of living increases[26]—historically indicate that support orders often did not adequately consider the situations. Consequently, the Child Support Guideline Committee sought to compensate by accommodating them, as well as other circumstances, under a new approach. One of the principles underlying the Guideline is to provide child support above the basic needs level. Guideline Report, *supra,* at 19 (Principle 3). Also, as the trial judge noted, the Guideline is based on the assumption that custodial parents devote a percentage of their income to support of their minor children, *see* Guideline, *supra* note 1, at 26 ("Child care responsibility and expenses are borne by the custodial parent."), but does not provide for a precise calculation of the support obligation of the custodial parent.

In the instant case, however, for example, the husband, a professional, is the custodial parent and he does not provide child care himself or pay for it since the child lives with her grandparents, and he contributes less than one third of the child's minimal needs. The wife, on the other hand, is a new doctor with substantial educational debts which the Guideline does not accommodate.[27] There was no evidence to suggest that the grandparents were not fully meeting the child's needs. On remand, the trial court declined to calculate Mr. Fitzgerald's child support obligation, being of the

---

**23.** Amici NCCR takes issue with the basic fairness of the Guideline. We have no occasion to rule on the fairness of certain provisions based purely on hypotheticals generated by amici NCCR.

**24.** For the view of one judge of the Superior Court who has offered his view of possible "exceptional" circumstances rebutting the presumption of applicability of the guidelines, see *G.L.M. v. E.H.S.,* 117 Daily Wash.L.Rptr. 1161, 1171 n. 13 (June 7, 1989) (von Kann, J.).

**25.** Although we hold that the Guideline is invalid, we in no way intend to disparage the yeoman efforts by the Child Support Guideline Committee to address a difficult and pressing

social problem. Indeed, in some respects its attempted modifications of existing law may well be an improvement thereon. Fortunately, its research and experience in applying the Guideline will be available for consideration by the legislature.

**26.** *See* H.R. Rep. 98–527 at 49; *G.L.M. v. E.H.S., supra* note 24, 117 Daily Wash.L.Rptr. at 1166 (quoting Guideline Report). *See also* Rosalyn B. Bell, Alimony and the Financially Dependent Spouse in Montgomery County, Maryland, 22 FAM. L.Q. 225 (1988).

**27.** Dr. Fitzgerald presented unrebutted evidence that she had educational debts in excess of $200,000 which were due to be paid.

opinion that "although the evidence showed that the custodial parent had been assisted for some time by his parents in supporting the minor child, such voluntary contributions should not reduce Dr. Fitzgerald's obligation, since it is Mr. Fitzgerald, not his parents, who is legally obligated."

The Fitzgeralds' circumstances do not fit the models of concern to the Child Support Guideline Committee.[28] As applied, the Guideline focused solely on the wife's gross income, offset initially only by her malpractice insurance premiums, without regard to either the amount of the husband's child support obligation or the subsistence needs of the wife.[29] Under these circumstances it can hardly be argued persuasively that the difference between a net income and a gross income approach is theoretical. Nor is it accurate to conclude that the Guideline maintains the parties' ultimate substantive right to "fact specific individual awards," *D.C. ex rel. K.K. v. W.R.C., supra* note 21, 117 Daily Wash.L.Rptr. at 1376, since there is no indication of the husband's expenses.

## CONCLUSION

The Superior Court Board of Judges had the authority to adopt the Child Support Guideline as a rebuttable presumption in the form of a rule of court so long as judges and hearing commissioners continue to exercise their discretion to achieve equitable results consistent with existing case law. The Guideline expressly intended to alter the whole process of determing child support. Amici WLDF concedes, and its concession is confirmed by the Guideline Report, that the Child Support Guide Committee viewed existing case law as contributing to the child support problem. However, notwithstanding inadequacies in the application of existing child support law in the District of Columbia found by the Guideline Committee, the Superior Court is without authority to use the Guideline to cure the deficiencies other than in a manner consistent with the nature of the limited Congressional delegation of authority to

it to act by court rules. Accordingly, since the Guideline changes substantive law, it is invalid, and we reverse the judgment as it relates to the child support award.

*Affirmed in part, reversed in part.*

TERRY, Associate Judge, concurring:

I join without reservation in the opinion of the court. I write separately to focus the spotlight on footnote 20 of that opinion, which briefly discusses, but does not decide, an issue concerning the manner in which the Child Support Guideline was adopted.

I agree that we need not decide this issue because we are invalidating the Guideline on other grounds. If that were not the case, I would hold, without a moment's hesitation, that the procedure by which the Guideline was developed and issued did not meet the minimal demands of due process, and that the Guideline was therefore void and unenforceable. If the Superior Court elects to issue new guidelines rather than deferring to the legislature, it should afford ample time and opportunity for public participation in the drafting process, either by holding open hearings or by publishing the guidelines for a sufficient period of public comment *before* they are scheduled to take effect, or (preferably) both.

Child support guidelines have a direct impact on the lives and fortunes of thousands of our citizens. They should not be written in shadows and promulgated in the dark of night. The secret proceedings of the Committee which drafted the present Guideline were not only inherently unfair but unworthy of a democratic society.

STEADMAN, Associate Judge, concurring in part and dissenting in part:

I begin, as does the majority, with the proposition that statutory language can derive "meaningful content from the purpose of the Act, its factual background and the statutory context," but draw a different conclusion with respect to the scope of the

---

**28.** *See* Guideline Report, at 4–8, 30–38.

**29.** The wife's financial statement showed a negative net worth and a monthly deficit of over $700.

guidelines language of D.C.Code § 11–1732(j)(4)(A) (1989 Repl.).

As the majority opinion relates in more detail, that code provision stemmed from the enactment by Congress of the Child Support Enforcement Amendments of 1984. Among other things, this enactment required that as a condition for receiving certain federal funds, each state and the District must establish guidelines for determining the amount of child support awards. 42 U.S.C. § 667(a) (Supp. IV 1986). Implementing regulations, promulgated in 1985, required that the guidelines "be based on specific descriptive and numeric criteria and result in a computation of the support obligation." 45 C.F.R. § 302.56(c) (1988). Both the law and the implementing regulations contemplated that the guidelines could be established "by law or by judicial or administrative action." 42 U.S.C. § 667(a) (Supp. IV 1986). The same law also required that each state establish expedited support procedures, 42 U.S.C. § 666(a)(2) (Supp. IV 1986) including hearings in which the presiding officer is not a judge. 45 C.F.R. § 303.101 (1988).

In 1986, Congress undertook to bring the District into compliance with these requirements as part of the District of Columbia Judicial Efficiency and Improvement Act. In addition to creating permanent authority for the appointment of hearing commissioners and expanding their authority to establish child support orders, the legislation contained the provision defining how those orders were to be arrived at; *viz.,* "as provided by law, and in accordance with guidelines established by rule of the Superior Court." D.C.Code § 11–732(j)(4)(A) (1989 Repl.). Thus, insofar as the District was concerned, Congress opted for judicially determined guidelines, and more specifically, guidelines developed by the Board of Judges of the Superior Court.

The nationwide guidelines requirement of the 1984 Child Support Enforcement Amendments was added in the Senate. The relevant Senate Committee report gives an indication of the role expected of the body developing the guidelines for a particular jurisdiction and the objectives of the guideline requirement:

Although the child support enforcement program has greatly strengthened the ability of children to have support orders established and collected, there remains a continuing problem that the amounts of support ordered are in many cases unrealistic. This frequently results in awards which are much lower than what is needed to provide reasonable funds for the needs of the child in the light of the absent parent's ability to pay. In some instances, however, there are also awards which are unrealistically high.

Some States have established guidelines to be used by the courts in setting the amount of child support orders. Where these guidelines exist, overall award levels tend to be somewhat higher than where the amount of the order is entirely discretionary with each judge. Moreover, the existence of guidelines tends to assure that there is reasonable consideration given both to the needs of the child and the ability of the absent parent to pay. This provides some protection for both parties.

The Committee amendment requires each State to develop a set of guidelines to be considered by judges and others authorized to order support in the State in determining support orders. The development of such guidelines will necessarily require States to devote some study to what is appropriate and to review what other States have done. For this reason, the amendment allows two full years (until October 1986) for States to develop the guidelines. The exact nature of the guidelines will be determined by each State and may be established by law or by a judicial conference or other mechanism as may be appropriate in that State.

The Committee recognizes that the development of a court order is a complex determination requiring the consideration of many aspects of the individual circumstances of the parties involved, and that there may be a need for courts to have the flexibility to exercise discretion. For

this reason, the amendment leaves to each State the decision as to how these guidelines are to be considered. It is the view of the Committee, however, that the very existence of a set of guidelines in each State will tend to improve the reasonableness and equity with which support orders are established.

S.REP. No. 387, 98th Cong., 2d Sess. 40, reprinted in 1984 U.S. CODE CONG. & ADMIN. NEWS 2397, 2436.

Thus, it seems contemplated that the development of the guidelines would be a major project, occupying perhaps two years, in which "necessarily" the guideline promulgators would devote study to "what is appropriate," including a review of what other jurisdictions were doing. The guidelines were to prevent "unrealistic" awards and apparently were expected to result in "somewhat higher" levels. Inequities between awards were to be avoided. Each jurisdiction would determine how to develop the guidelines, "by law or by a judicial conference or other mechanism." These appear to be strong expectations for the guidelines, seeming to rest uneasily with an unchanged application of the status quo.

Turning to the D.C. guidelines enactment before us, the parties presented us with several differing interpretations. Appellant and her associated amici argued that to the degree the guidelines deviate from existing law, they exceed the scope of delegated power and are therefore invalid, the position adopted by the majority here. I think the apparent congressional expectations for the guidelines requirement counsel against such a narrow reading. Corporation Counsel, on the other hand, appears

to view the statute as constituting a delegation by Congress of virtually total legislative power in the area.[1] He reads the phrase "as provided by law" to refer only to legislatively-enacted law and the Constitution, rather than case law. This in my judgment goes too far in effectively reading the phrase out of the Act.

Rather, I would construe the statutory language to provide that the guidelines be developed against the broad backdrop of the bedrock objectives of existing law—*viz.*, protecting the best interests of a child under an equitable allocation of parental support responsibility—coupled with a realistic appreciation that elements of that law could be significantly affected and modified in achieving the goals of uniformity, predictability, and fairness sought by the imposition of a guidelines requirement.[2] In our jurisdiction, the existing law was characterized by a very large measure of discretion in the child support decisionmaker to determine somewhat amorphously-defined needs of the child and the parents' ability to pay. *See, e.g., E.R.B. v. J.H.F.*, 496 A.2d 607 (D.C.1985); *Brice v. Brice*, 411 A.2d 340 (D.C.1980); *Moore v. Moore*, 391 A.2d 762 (D.C.1978); *Wright v. Wright*, 386 A.2d 1191 (D.C.1978). By definition, guidelines are intended to channelize the broad exercise of discretion, and the Superior Court is the entity closest to day-to-day experience in that regard. Furthermore, the federal requirement that the guidelines must be based "on specific descriptive and numeric criteria and result in a computation of the support obligation"[3] raised the distinct possibility of modification. And as the above-quoted Committee report indi-

---

**1.** In the District this presents no delegation or separation of powers problem. *See Palmore v. United States*, 411 U.S. 389, 397, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973) (Congress may exercise within the District all legislative powers that the legislature of a state might exercise and may distribute judicial authority as it sees fit); *Keller v. Potomac Electric Power Co.*, 261 U.S. 428, 442–43, 43 S.Ct. 445, 448–49, 67 L.Ed. 731 (1923) (grant by Congress of legislative power to District courts to review and change rates of Public Utilities Commission upheld); *cf. Mistretta v. United States*, —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (upholding Federal Sentencing Guidelines).

**2.** I am not unmindful that the guidelines are to be established by "rule," but I am not convinced that limitations otherwise applicable to such rules must perforce be carried over intact to the guidelines.

**3.** 45 C.F.R. § 302.56(c) (1988). That implementing regulation was promulgated in May 1985, well in advance of the consideration and passage by the Congress of the D.C. guidelines statute.

cated, the very process of drawing up guidelines was expected to be an occasion of review and study.[4]

The two significant departures in the Guideline from existing law presented by the case before us are elements of the methods for calculating the needs of the child and for determining ability to pay.

With respect to the first, it is true that the pre-existing practice tended to focus on the needs of the child in isolation, typically relying on a financial statement prepared by the custodial parent showing actual present expenditures for the child. However, increasingly our decisions had come to recognize that a child's interests must be addressed in the context of the parents' overall financial status. *Benvenuto v. Benvenuto*, 389 A.2d 795, 799 (D.C.1978) (factor to be considered in determining needs is "the standard of living which the child would have enjoyed had the marriage not been dissolved"); *Cooper v. Cooper*, 472 A.2d 878, 880–81 (D.C.1984) ("best interests of the children must be assessed in the context of the standard of living to which the children have become accustomed"). It seems a natural and permissible development that the Guideline should review the needs of the child "as a function of parental income"[5] rather than relying upon financial statements and testimony of the parties—an individualized and subjective procedure.

With respect to the allegedly improper use of gross income rather than net income

as pre-existing law phrased the requirement, several observations may be made. First, whether net or gross income is used, the aim is the same: to devise a formula capable of wide application that will lead to fair and consistent results in the bulk of child support cases. Under pre-existing law, the determination of net income was left to the informed discretion of the trial court, with, inevitably, differences in application and treatment. *See, e.g., Plumley v. Plumley*, 465 A.2d 393, 394–95 (trial court ordered to make a detailed financial analysis of the parties' "net disposable income[s], based on all legitimate financial obligations") (citation omitted). Thus, rather than some objectively arrived-at figure, net income in fact was a floating concept with wide discretionary ranges. Gross income, the Guidelines Committee determined, is "not subject to as many variations and manipulations as is net income and is easier to ascertain and verify." Guideline, *supra* note 4, at 22. With both uniformity and predictability as objectives underlying the concept of the Guideline, I do not think it is inconsistent with the broad purposes motivating the congressional requirement of guidelines to use this somewhat different starting point for determining equitable ability to pay, which is the underlying aim. Indeed, to some extent the difference between the two standards could be theoretical, since if net income were used then the percentage figure allocable to child support would presumably be increased to compensate.[6]

4. Indeed, the Guideline as promulgated is itself stated to be an evolving document under continuing study and subject to refinement. District of Columbia Superior Court Child Support Guideline, 2 D.C. Ct. Rules Ann. 19, 20 (1989) (Introduction).

5. The basic conclusion of the Committee, expressed in its Report of the District of Columbia Superior Court Child Support Guidelines Committee 10 (April 1988), was that "[a] proper calculation of the costs of rearing a child is dependent upon the income of the parents and is a function of that income; it is inappropriate to attempt to establish the amount of the financial needs of the child as though that figure were independent of parental income."

6. This is not to say that circumstances could not arise where the application of the gross income

formula rather than net income would result in such distortion that the application of the Guideline would be drawn into question—hence, the importance of the presumption, as discussed in the majority opinion, in this and other applications of the Guideline. However, the recent amendment to 42 U.S.C. § 667(b) presumably will require a re-examination of this provision of the Guideline and further discussion would be fruitless at this point. Likewise, in light of the majority holding, I do not venture to examine the specific impact of the Guideline in its present form on the facts here, as determined by the trial court.

With respect to the procedures followed in adoption of the Guideline, it is fair to note that the Guideline stemmed from a Committee appointed in mid–1985 consisting of four judges, two commissioners, and nine lay members,

Accordingly, while I am fully in agreement with respect to the child custody issue, I respectfully dissent from the limitation of the Guideline authority to existing law.

eight of whom were attorneys. The Committee met an average of once every two weeks for over two years. Subcommittees were established to pursue some aspects of the Committee's work and report back to the entire Committee. The Committee reports that it consulted many sources as part of its deliberations, and a number of experts addressed the Committee. Presentations and materials were furnished to the judges of the Superior Court on three different occasions. Report, *supra* note 5, at 2–3. Final approval of the Guideline on September 28, 1987, by the Board of Judges occurred bare-ly in time to meet the statutorily imposed deadline of October 1, 1987, for promulgation of the Guideline under which both the Committee, and the Board of Judges were laboring. While reasonable people may certainly differ as to what requisite or optimal procedures should be followed in promulgating the Guideline, I am not prepared to join in any sweeping pejorative denunciation (as the concurrence perhaps might be read) of a process that was, I have no reason to doubt, a sincere and arduous effort to timely perform a congressionally mandated task.