**CHILDRENS AND PARENTS RIGHTS ASSOCIATION OF OHIO, INC., (CAPRA), Plaintiff,**

v.

**Louis W. SULLIVAN, et al., Defendants.**

**No. 4:90 CV 297.**

United States District Court, N.D. Ohio, E.D.

Dec. 11, 1991.

---

Robert M. Fertel, Sanford J. Berger, Berger & Fertel, Cleveland, Ohio, for plaintiff.

Lynne H. Buck, Michael Anne Johnson, Asst. U.S. Attys., Office of the U.S. Atty.,

Cleveland, Ohio, Karen Lee Lazorishak, Office of the Ohio State Atty. Gen., Columbus, Ohio, Robert K. Coulter, Dept. of Justice, Tax Div., Washington, D.C., Loren L. Braverman, Office of the Atty. Gen., Shawn H. Nau, Columbus, Ohio, Steven D. Bell, Janik & Bell, Cleveland, Ohio, David J. Betras, Law Office of David J. Betras, Stuart–Banks, Youngstown, Ohio, for defendants.

## ORDER

BATTISTI, District Judge.

Before the Court are: (1) a motion for declaratory and injunctive relief filed by Plaintiff Childrens and Parents Rights Association of Ohio, Inc. (CAPRA); (2) Defendant Ohio Department of Human Service's (ODHS) Motion to Dismiss; (3) Defendant Judge John H. Leskovyansky's Motion to Dismiss; (4) Defendants Louis W. Sullivan, Secretary of the Department of Health and Human Services (HHS), and Office of Child Support Enforcement's (OCSE) Motion for Summary Judgment.

For the reasons set forth below, the Court denies in part Plaintiff's motion. The Court grants Defendants ODHS and Judge Leskovyansky's respective Motions to Dismiss. The Court also grants in part Defendant HHS and OCSE's Motion for Summary Judgment.

## FACTS

Plaintiff raises numerous constitutional challenges to federal child support laws and corresponding state laws. This comprehensive system is intended to produce equitable awards of child support; it also includes enforcement mechanisms designed to ensure prompt payment.

The federal government has played a role in child support enforcement since 1950. Its initial efforts in the area were limited to an amendment to the Social Security Act, requiring state welfare agencies to notify appropriate law enforcement officials when a child who had been abandoned by a parent became a recipient of Aid to Families with Dependent Children (AFDC). Pub.L. 81–734, § 321(b).

It was not until the Child Support Enforcement Program was signed into law in 1975, however, that the federal government became a major participant in such programs. 42 U.S.C. §§ 651–669 (hereinafter referred to as Title IV–D). The 1975 Act opened up Title IV–D services, previously intended to benefit children receiving AFDC benefits, and made them available to non-welfare families as well.

Title IV–D authorized federal financial assistance for a range of state programs and services designed to encourage state enforcement of child support obligations. The goals of the program as a whole included: location of obligors, establishment of paternity, establishment of support, and enforcement of support. While the states retained basic responsibility for establishing paternity and collecting child support, the then Department of Health, Education and Welfare (HEW) was cast in a supervisory and assisting role. At that time, the Secretary of HEW created OCSE to administer the federal program.[1]

Despite Congressional efforts, problems remained with the amounts for child support varying from awards that were too low to provide reasonable funds for the needs of the children to awards which were so high as to be equally unreasonable and likely to exacerbate tensions.

Therefore, in 1984, Congress passed additional amendments. The amendments again emphasized the universal availability of Title IV–D benefits. See 42 U.S.C. § 651; 1984 U.S.Code Cong. & Admin.News at 2397, 2418–1419. More importantly, using as an example the efforts of a few states that had begun to use guidelines for setting child support levels, the amendments required that all states receiving federal funding develop similar guidelines. Pub.L. 98–378, § 18. Congress concluded that "the very existence of a set of guidelines in each state will tend to improve the reasonableness and equity with which support orders are established." 1984 U.S.Code Cong. & Admin.News at 2436.

---

1. HEW became HHS on May 4, 1980.

Following the enactment of the 1984 amendments, the Secretary of Health and Human Services promulgated regulations which also are at issue in the present litigation. The regulations require that the state guidelines "be based on specific descriptive and numeric criteria." 45 C.F.R. § 302.56(c). The numeric criteria may "include factors such as, but not limited to, income and resources of the parents and the number and needs of dependents." 50 Fed.Reg. 19643 (May 9, 1985).

Again, changes in the law proved to be insufficient. The legislative history behind the most recent amendments, the Family Support Act of 1988, indicated that:

> The problem of nonsupport of children has become a serious one for this country. Nearly one-quarter of all children now live with only one parent. And although many noncustodial parents are diligent payers of child support, there are millions who are not. The Census Bureau data tells us that of the 8.8 million mothers with children whose fathers were not living in the home in the spring of 1986, 3.4 million, or nearly 40 per cent of these mothers, have never been awarded support for their children. ... Of those who had been awarded and were due support in 1986, only half received the full amount they were due.

S.Rep. 377, 100th Cong.2d Sess. (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 2776, 2785.

In a renewed effort to remedy the situation, the new legislation altered the use of guidelines for determining appropriate levels of child support. Pub.L. 100–485. The guidelines, previously not binding on judicial decisionmakers, now create rebuttable presumptions that their result is the correct amount of child support. A written finding overcomes the rebuttable presumption. 42 U.S.C. § 667(b). States must review their guidelines periodically. 42 U.S.C. § 667.

The 1988 Act, moreover, established strict enforcement measures. In particular, states must provide for mandatory wage withholding, without waiting for an arrearage, except where the state finds good cause to act otherwise or both parents agree to an alternative arrangement. 42 U.S.C. § 666.

In keeping with the concept of "cooperative federalism," federal and state laws mesh together in the area of child support. Starting in 1975, states that wish to participate in AFDC also are required to take part in Title IV–D. Federal funding is available only if the state complies with both AFDC and Title IV–D and regulations promulgated thereunder. *See* 42 U.S.C. §§ 601, 602(a)(27), 654(13).

The state of Ohio has elected to participate in the AFDC program. Accordingly, the state also takes part in Title IV–D. It has promulgated its own set of guidelines.

When the present litigation began, the guidelines were embodied by Supreme Court of Ohio Rule 75 (effective October 1, 1987). On April 12, 1990, the judicially promulgated guidelines were superseded as Amended Substitute House Bill Number 591 became law.

The new guidelines are entitled "Basic Child Support Schedule," and consist of a table which uses the combined gross income of both parents along with their total number of children to determine an overall figure. The overall figure is then divided between the parents so that each of them is responsible for the same proportion as their income represents of their combined income. Thus, for example, a non-custodial parent whose income was double that of the custodial parent would have twice the child support obligations. The table does not apply, however, if the parents' combined gross income is less than $6000 or more than $120,000. *See generally* Ohio Rev.Code Ann. § 3113.215 (Page 1990 Supp.)

Plaintiff in its Amended Complaint makes the following claims concerning the child support system:[2]

1. The Ohio Guidelines violate the Supremacy Clause of Article VI, Clause 2 of the Constitution;

---

**2.** This arrangement and numbering has been adopted by the Court for convenience.

2. The Ohio Guidelines violate fundamental rights to marry and procreate, and therefore violate the Fifth and Fourteenth Amendments to the Constitution;

3. The Ohio Guidelines violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution;

4. Ohio Revised Code §§ 2301.35 and 3113.211 violate the Fifth and Fourteenth Amendments to the Constitution;

5. 42 U.S.C. § 667 violates the Appointments Clause of Article II, Section 2, Clause 2 of the United States Constitution;

6. Section 667 violates the doctrine of separation of powers;

7. Section 667 constitutes an improper delegation of Congressional legislative powers;

8. Section 667 violates the Spending Clause of Article I, Section 8, Clause 1 of the Constitution;

9. Section 667 violates the Contract Clause of Article I, Section 10 of the Constitution;

10. Section 667 violates prohibitions against ex post facto laws found in Article I, Section 8, Clause 3, and Article I, Section 10, Clause 1 of the Constitution;

11. HHS and OCSE have exceeded the authority delegated to them by Congress pursuant to 42 U.S.C. § 667;

12. Section 667 and guidelines developed thereunder violate the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution.

In large part, Plaintiff's claims rest on the theory that:

[The] Guidelines were based on the premise that a child's standard of living after a divorce should be the same as when the family was an intact household, as the economic studies which were the foundation and basis for determining child support were based on costs expended for raising a child in intact homes at differing incomes, rather than the reality that there would now be the expense of maintaining two households for dovorced [sic] parents.

Plaintiff's Class Action Amended Complaint for Declaratory and Injunctive Relief at 3 (unnumbered pages). In addition, Plaintiff asserts that the system for determining child support levels and enforcing payment does not distinguish properly between its membership, "responsible non-custodial parents," and individuals receiving welfare or whose children receive welfare, in Plaintiff's words, "irresponsible 'deadbeats.'"

Plaintiff seeks declaratory and injunctive relief.

Plaintiff describes itself as "an umbrella organization of groups in the state of Ohio that are comprised of, and represent the interests of, non-custodial parents and their families." Plaintiff's Amended Complaint at 2 (unnumbered pages). In its original complaint and motion for declaratory and injunctive relief, Plaintiff did not provide more than that bare and conclusory description of itself. Without more detail than such a self-styled reference to an "umbrella organization," the Court determined that CAPRA had not provided a sufficient factual basis for its standing to maintain the litigation. Therefore, this Court required that Plaintiff file additional information in support of its standing. *See* Order of June 10, 1991.

Plaintiff subsequently included in its Amended Complaint "by way of illustration," numerous references to cases involving its members. The Amended Complaint stated that:

(1) Robert C. Geiger, Jr., was paying child support based on his income and his new wife's income, "thereby preventing him and his new wife from establishing a family due to lack of sufficient funds;"

(2) Jack C. Riddle, was paying child support in a sum which failed to take into account the fact that his ex-wife had remarried and she and her new husband had a combined gross income of over $100,000;

(3) Dennis Lehman, whose child support was increased by $200 per month, declared personal bankruptcy;

(4) James E. Fellows paid child support even though his wife had not demonstrated any need to receive it;

(5) Eugene Fisher, whose child support was increased by $350 per month, was unable to support his new family "by working his historical forty (40) hours per week;"

(6) Louis Febinger, Jr., whose child support increased by $140.00 per month, declared personal bankruptcy.

In addition, Plaintiff filed an affidavit of Andrew J. Cvercko, counsel for Randal Stan. Like the individuals listed in the complaint, Stan is a member of CAPRA. The affidavit provided three pages detailing the budgets of Stan, his ex-wife, minor child, and parents, respectively. The specific complaint raised by Stan is that the state, in determining his obligations, did not consider his parents' financial contributions to their grandchild.

The history of CAPRA and the full scope of its membership remain unclear. Plaintiff apparently is not an "umbrella organization," or association of groups, but rather consists of individual members. Regardless, Plaintiff has not specified the interests of individuals who have joined its group, their total numbers, the purposes of the organization aside from pursuing this litigation, where and when the group was founded, and numerous other details that are generally available for groups of its nature.

## DISCUSSION

As a threshold issue, HHS has challenged federal question jurisdiction over this litigation. HHS argues that the purported federal questions are "wholly insubstantial" if not "obviously frivolous." The Court does not agree. While a few of Plaintiff CAPRA's claims are almost frivolous, some of them present at least a substantial federal question. Accordingly, jurisdiction exists.

## I. STANDING

CAPRA does not have standing to pursue its claims against either ODHS or Judge Leskovyansky, but does have standing to pursue its claims against HHS. An association has standing to bring suit on behalf of its membership where: (1) its members themselves would have standing to sue; (2) it seeks to protect interests that are germane to its own purpose; (3) neither the claim nor the requested relief require the participation of its members in the suit. *Hunt v. Washington Apple State Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

An association that satisfies the three parts of the standing test can proceed with its suit "[e]ven in the absence of injury to itself." *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). *See* Order of June 10, 1991. For the purposes of a motion to dismiss for lack of standing, the allegations of the complaint are taken as true and the complaint is construed in favor of the plaintiff. *See Warth*, 422 U.S. at 501, 95 S.Ct. at 2206.

### A. STANDING WITH REGARD TO ODHS

CAPRA fails the first part of the associational standing test, at least with regard to ODHS and Judge Leskovyansky. It does not have standing to sue because its members would not have standing to sue.

An individual has standing only if he establishes an injury in fact, one which is not "abstract," "conjectural," or "hypothetical," but rather, "distinct and palpable." *Allen v. Wright*, 468 U.S. 737, 750–52, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984) (internal quotes omitted). Furthermore, the party must demonstrate not only causation but also redressability. That is, the defendant's conduct must have caused the harm and a court ruling in favor of the plaintiff must be likely to remedy that harm. *Id.* at 753 n. 19, 104 S.Ct. at 3325 n. 19. *See also Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (summarizing current standing requirements); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438

U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (finding standing to challenge constitutionality of federal statute limiting liability for nuclear reactor accidents); *Heimberger v. School District of Saginaw,* 881 F.2d 242, 245 (6th Cir.1989); Order of June 10, 1991; E. Chemerinsky, *Federal Jurisdiction* § 2.3 at 63–71 (1989).

CAPRA has overcome some of the defects and faults in its earlier complaint, which alleged only abstract and broad constitutional violations, by providing concrete and specific instances of legal actions involving its membership. CAPRA members have had judgments entered against them under the current child support framework. Consequently, its members are subject to continuing obligations. Although CAPRA has arguably established an injury in fact, the nature of that injury shows that it cannot establish the required elements of causation and redressability.

In essence, Plaintiff's membership does not dispute that they must help raise their children by providing financial support. Indeed, Plaintiff goes so far as to claim that its members are eager to share in the child-rearing process. But their challenge is directed toward the general methods of determining appropriate amounts for child support obligations.

Accordingly, most of Plaintiff's claims focus on the federal requirements that the state guidelines for computing awards be specific and numeric, and that state courts give the resulting figures the status of rebuttable presumptions. 45 C.F.R. § 302.-56; 42 U.S.C. § 667(b)(2).

The language of the regulation reads in relevant part: "[The guidelines] must be based on specific descriptive and numeric criteria and result in a computation of the support obligation." 45 C.F.R. § 302.56(c). Among the numeric factors that may be included are "income and resources of the

parents and the number and needs of dependents." 50 Fed.Reg. 19643 (May 9, 1985).

The language of the statute reads as follows:

(2) There shall be a rebuttable presumption, in any judicial or administrative proceeding for the award of child support, that the amount of the award which would result from the application of such guidelines is the correct amount of child support to be awarded. A written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case, as determined under criteria established by the State, shall be sufficient to rebut the presumption in that case.

42 U.S.C. § 667(b). It is important to note that the rebuttable presumption is just that: in any given case, a state court judge is able to make findings that would rebut the presumption and, thus, make inapplicable the numeric figures generated by the guidelines.

The state guidelines involved in the present case comply with federal law. Plaintiff has not alleged that they are other than specific and numeric, or that state courts do anything but give the resulting figures the status of rebuttable presumptions.[3]

For this reason, Plaintiff cannot demonstrate either causation or redressability insofar as ODHS and Judge Leskovyansky are concerned. Neither Defendant is responsible for the claimed injury in fact.

As a result, even if the Court granted relief by finding that the particular state guidelines and procedures currently in place are unconstitutional, the state would be forced to develop another set of guidelines and procedures. Under that set of guidelines and procedures, Plaintiff's membership again would be subject to child

---

**3.** Plaintiff virtually concedes that its case is concerned not with state but with federal requirements. In its response to federal defendants' motion to dismiss, Plaintiff states: "The determining factor in the present case is whether or not 2 U.S.C. § 667 and/or the promulgation of 45 C.F.R. § 302.56(c) by the Secretary were substantial factors in motivating the state of Ohio's

actions in establishing the Ohio Child Support Guidelines.... In that regard, it has already been admitted by all the defendants that the Ohio Guidelines were established pursuant to federal statutory and regulatory requirements." Plaintiff's Response to Federal Defendants' Motion to Dismiss at 1. Plaintiff makes similar statements throughout its pleadings.

support obligations. More importantly, pursuant to federal law, whatever new set of guidelines and procedures were developed would be specific and numeric and would involve rebuttable presumptions. They would lead to the same alleged injury in fact. Thus, Plaintiff could not obtain relief unless the state took steps to disregard federal policies.

Plaintiff's claim to standing fares poorly compared with a recent Sixth Circuit case where standing also did not exist. In that case, even if plaintiffs had prevailed, defendants could have instituted a different policy imposing the same alleged harm. *Heimberger*, 881 F.2d 242. In the present case, even if Plaintiff prevails, Defendant must institute a similar policy imposing the same alleged harm.

It appears possible that the state of Ohio, and as a corollary, ODHS, could choose to forego participation in the federal child support framework. If it abandoned the federal child support framework, it might then develop an entirely new system for figuring child support obligations. This scenario would require the state to give up substantial federal assistance. *See* 42 U.S.C. §§ 601, 602(a)(27), 654(13).

Assuming for argument that the state could avoid complying with Title IV–D, the possibility it would do so is entirely speculative. It is much more tenuous than, for example, the "chain of causation" between Internal Revenue Service policies allowing racially discriminatory schools to enjoy tax-exempt status and the continuing existence of such schools, which could not sustain standing. *Allen*, 468 U.S. 737, 104 S.Ct. 3315. *See also Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (causation and redressability too speculative to support standing).

■ The only possible exception to the Plaintiff's lack of standing against ODHS concerns the poundage fees collected from support obligors. The relationship between ODHS and the poundage fees is unclear. Assuming, *arguendo*, that Plain-

tiff's allegations are properly directed at ODHS, they are almost frivolous.

Under the state statute:

Whenever a court, on or after October 5, 1987, issues a support order or modifies a support order, regardless of when the modified support order was issued, the child support enforcement agency shall collect two per cent of the support payment to be collected under a support order, or one dollar per month, whichever is greater, from the obligor to provide funds for that part of the program for child support enforcement that is not paid for by federal funds.

Ohio Rev.Code § 2301.35(H)(1). A parallel provision imposes a poundage fee of one percent taken by the employer, "as a charge for its services in complying with the order." Ohio Rev.Code § 3113.211.

In sum, Plaintiff argues that the poundage fees are unconstitutional punishment and discrimination against wealthier parents. They are neither punitive nor discriminatory. The fees are in no sense punishment. The assessment of the fees does not depend upon nor affect any suspect classification. Therefore, the fees need only have a rational basis. *Cf. Agg v. Flanagan*, 855 F.2d 336, 341–42 (6th Cir. 1988) (child support statute did not discriminate against men). Here, the reason expressed within the statute itself is sufficient: the fees offset administrative expenses associated with administering and enforcing child support laws.

B. STANDING WITH REGARD TO JUDGE LESKOVYANSKY,

Plaintiff's lack of standing is especially apparent with respect to Judge Leskovyansky. In addition to the problems of causation and redressability already discussed, lack of standing against Judge Leskovyansky is related to the doctrine of judicial immunity.

■ The doctrine of judicial immunity, which is favored because it allows judges to apply the law without fear of personal consequences and prevents circumvention of the appellate process, does not apply where the requested relief is injunctive.

"[J]udicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Pulliam v. Allen,* 466 U.S. 522, 541–42, 104 S.Ct. 1970, 1980–81, 80 L.Ed.2d 565 (1984).

However, Plaintiff has not made out any case or controversy between its membership and Judge Leskovyansky. In its constitutional challenges, Plaintiff has not faulted any of Judge Leskovyansky's particular rulings or policies. They cannot allege that Judge Leskovyansky played a role in formulating state guidelines and procedures. Like other state judges, he only applies them.

As other courts have recognized, a judge "sit[s] without a personal or institutional stake on either side of the constitutional controversy." *In re Justices of the Supreme Court of Puerto Rico,* 695 F.2d 17, 21 (1st Cir.1982). *See also Pulliam,* 466 U.S. at 538 n. 18, 104 S.Ct. at 1979 n. 18 (*citing In re Justices,* 695 F.2d 17); *R.W.T. v. Dalton,* 712 F.2d 1225 (8th Cir.1983), *cert. denied* 464 U.S. 1009, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). Forcing a judge to defend such a lawsuit compromises the judicial role of neutrality. *In re Justices,* 695 F.2d at 25.[4] In most situations, a ruling that a statute is unconstitutional should be sufficient to prevent a judge from applying it, though in a few rare instances, of which this is not one, it would remain necessary to enjoin the judge.

Furthermore, to the extent that Plaintiff's claims focus on state court errors in applying state law to individual cases, Plaintiff lacks standing because "[t]he proper course to correct a mistake is by appeal." *Agg,* 855 F.2d at 339.

## C. STANDING WITH REGARD TO HHS

■ For the same reasons that CAPRA does not have standing to pursue a case against ODHS or Judge Leskovyansky, it does possess standing in its claims against HHS. As detailed above, its real interest is in challenging the scope of federal regulation of child support. It is federal statutes and regulations that have required the contested procedures; if federal statutes and regulations were unconstitutional, Plaintiffs would gain relief from the use of specific and numeric rebuttable presumptions in calculating child support awards.

The standing analysis is not altered substantially by the fact that some of Plaintiff's membership might benefit from the current scheme, either because they eventually gain custody and in turn receive child support awards, or because an alternative scheme might result in greater obligations.

The Supreme Court has rejected a similar argument, that a union could not satisfy the associational standing requirements in part because under the challenged regulations, some of its members had received benefits. *Automobile Workers v. Brock,* 477 U.S. 274, 283–84, 106 S.Ct. 2523, 2529–30, 91 L.Ed.2d 228 (1986). The arguments "simply miss the point" because the suits in question do not seek benefits directly. *Id.* In this case, Plaintiff attacks not specific amounts of particular child support awards, but instead the general procedures used to calculate them.

With respect to HHS, Plaintiff still must satisfy the second and third parts of the associational standing test. It must seek to protect interests germane to its purpose and the suit must not require participation of its members individually. CAPRA seems to be protecting interests germane to its own purpose. Its claims do not require any non-custodial parents to serve as parties.

The lack of detail concerning Plaintiff, though frustrating, is not fatal to their standing. But the Court notes that Plaintiff tests the limits of its standing by occasionally appearing to argue against the best interests of some of its ostensible

---

**4.** Although the reasoning used in *In re Justices* differs slightly from the precedent later established by the Supreme Court in *Pulliam,* the discussion of standing from the former case was approved in the latter. *Pulliam,* 466 U.S. at 538 n. 18, 104 S.Ct. at 1979 n. 18. While the *In re Justices* court based its holding on a statutory ground rather on its constitutional analysis, this Court relies on the constitutional analysis.

membership. Plaintiff's members have revealed inconsistencies in two ways.

First, despite their choice of a name that suggests that they represent non-custodial parents, both fathers and mothers, their examples suggest that their organization represents only the former. But if they obtain any relief, it would necessarily benefit both groups.

Second, even among divorced men, at the same time that Plaintiff asserts a broad definition of its membership, it also takes pains to indicate that "what CAPRA members *are not* is of even greater importance." They state in no uncertain terms that they are neither young fathers nor poor ones. Plaintiff's Motion for Preliminary and Permanent Injunctions and Declaratory Judgments at 1–2 (emphasis in original). Thus, Plaintiff contradicts its own claims to representing all divorced non-custodial parents. Plaintiff has undermined its standing, but short of the point of collapse.

Plaintiff also seeks class certification. As the Court has recognized that CAPRA possesses associational standing to pursue the litigation against HHS, class certification would not serve any useful purpose. Furthermore, CAPRA has not sufficiently defined the class of which its membership purportedly is a part. As just discussed, CAPRA has not adequately shown that its membership has claims that are representative and it has cast doubt on its ability to "fairly and adequately represent the interests of the class." *See* Fed.R.Civ.Pro. 23(a).

## II. OVERVIEW

As an initial matter, HHS is correct in its argument that a deferential standard of review applies to challenges to the Social Security Act. *See Bowen v. Gilliard,* 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987). "Governmental decisions to spend money to improve the general public welfare in one way and not another are 'not confided to the courts.' The discretion belongs to Congress unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment." *Id.* at 598,

107 S.Ct. at 30 (internal quotes omitted). Furthermore, as HHS has brought to the Court's attention, constitutional challenges to other aspects of the child support system have been rejected. *See Agg,* 855 F.2d at 340; *Fitzgerald v. Fitzgerald,* 566 A.2d 719 (D.C.App.1989).

Plaintiff's case, however, is not limited to challenging governmental decisions to spend public monies in one manner rather than another. While Plaintiff might merely be motivated by dissatisfaction over the level of child support obligations in individual cases, Plaintiff also presents arguments with broader implications. Notwithstanding the deferential standard of review of challenges to funding under the Social Security Act, the Act and HHS regulations must comport with constitutional standards.

## III. PLAINTIFF'S CLAIMS 5, 6 AND 7

■ CAPRA raises several related issues of federalism. CAPRA argues that the role of states under the child support laws violates both the appointments clause by infringing on the exclusive powers of the executive branch of the federal government (claim 5) and the doctrine of separation of powers by infringing on the exclusive powers of the legislative branch of the federal government (claims 6 and 7). Simply put, CAPRA contends that the states play too large a role in determining the amount of child support. Because Plaintiff relies on case law of dubious relevance to fashion its own theory of the constitution, its position is tenuous.

In particular, Plaintiff relies on a Depression-era Supreme Court decision which invalidated provisions of the National Industrial Recovery Act, on the ground that the Act exceeded the scope of Congressional power under the commerce clause. *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). Plaintiff also cites *Panama Refining Company v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). The *Schechter* opinion is no longer controlling authority on the commerce clause, much less persuasive in the present context. The

*Panama Refining Company* opinion holds a similar status. *See Mistretta v. United States*, 488 U.S. 361, 373, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989).

Plaintiff also argues that, as Congress cannot delegate its power to enact legislation to one of its houses or a committee, "delegation of formulating national policy to [HHS] and/or the States would be likewise unconstitutional." Plaintiff cites a concurring opinion in a case concerning the constitutionality of parts of the Gramm–Rudman Act. *Bowsher v. Synar*, 478 U.S. 714, 737, 106 S.Ct. 3181, 3193, 92 L.Ed.2d 583 (1986) (Stevens, J., concurring). The *Bowsher* case, however, addressed the relationship between the legislative and executive branches of the federal government. It does not speak directly to the relationship between the federal government as a whole and the states.

Although Plaintiff asserts the reasoning from *Bowsher* can be applied to the instant case, it does not provide any reasoning for drawing such an analogy. Even were Plaintiff's proposition true, that the Supreme Court has disapproved of federal legislative programs having significant state involvement, Plaintiff has not shown that the child support laws fall within the category deemed invalid. The states have not been left with unbridled discretion: it is clear that they must establish some form of specific and numeric guidelines, the results from which are rebuttably presumed correct, in order to receive AFDC funding.

Adopting Plaintiff's view would mean that federal policies could not be executed with state cooperation. If Plaintiff's constitutional theory were adopted, the federal government could not leave any decision to the states. All welfare programs necessarily would either be federally administered

in whole, or left to the state entirely. The Constitution does not require such a result.[5]

Indeed, the Supreme Court has stated approvingly that "[t]he AFDC program is based on a scheme of cooperative federalism." *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). *See also National Welfare Rights Organization v. Mathews*, 533 F.2d 637, 641 (D.C.Cir.1976) (discussing Congressional intent to provide state participation under the Social Security Act). CAPRA objects to the general relationship of the federal and state governments in the area of child support; as discussed earlier, it does not raise a claim that Ohio interpretation and application of statutes and regulations contravenes federal authority. Conversely, if Plaintiff had raised a claim of state disregard for federal policies, its challenge to a scheme of cooperative federalism would have greater merit. In *King*, the Supreme Court struck down an Alabama law that interfered with federal policies regarding AFDC assistance. *King*, 392 U.S. 309, 88 S.Ct. 2128.[6]

## IV. PLAINTIFF'S CLAIM 8

■ Plaintiff exercises its right to present arguments in the alternative. While its other claims assert that the federal government is insufficiently involved in child support determinations, having improperly delegated its authority, CAPRA's claim 8 takes the opposite approach and contends that the federal government is overly involved in child support determinations, in violation of the Spending Clause of the Constitution. Again, Plaintiff's contentions are not borne out in the case law.

The Spending Clause reads:

**5.** Plaintiff itself collapses its arguments based on the appointments clause and separation of powers doctrine into an argument about whether HHS exceeded its authority. In a section of its brief bearing the heading, "Appointments Clause and Separation of Powers Arguments," CAPRA reduces its claim to the following: *"But, it is the responsibility of the agency to remain within the confines of the governing legislation and employ procedures that conform to the law."* Plaintiff's Response to Federal Defen-

dants' Motion to Dismiss at 12 (emphasis in original). This is the same issue of HHS exceeding its delegated authority, presented in claim 11, discussed, *infra*.

**6.** Plaintiff has not raised and the Court need not consider the constitutional problems posed by states' rights, as might arguably arise if a state in its child support laws wished to diverge dramatically from federal policies.

The Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, and pay the Debts and provide for the common Defense and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States.

Art. I., § 8, cl. 1.

The relevant case law teaches that Congress has authority of great breadth in its use of the spending power. In its most recent discussion of the clause, the Supreme Court upheld a federal statute requiring that states prohibit the sale of alcoholic beverages to individuals under the age of twenty-one as a condition for receiving federal funding for highways. *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). *See also Commonwealth of Kentucky v. Donovan*, 704 F.2d 288, 298–300 (6th Cir.1983).

In *South Dakota*, the Court raised but did not reach the possibility that the Congress could not directly enact a national drinking age because of the Twenty-first Amendment. *South Dakota*, 483 U.S. at 205–06, 107 S.Ct. at 2795–96. Instead, the Court held that the indirect use of spending power was "within constitutional bounds even if Congress may not directly regulate drinking age." *Id.* at 206, 107 S.Ct. at 2795. Here, Plaintiff has not shown that Congress cannot act directly, much less that it cannot act indirectly.

The *South Dakota* Court did recognize that the spending power is not unlimited. It is bounded by three criteria. First, "the exercise of the spending power must be in pursuit of 'the general welfare.'" Second, if Congress sets conditions on the receipt of federal funds, it must do so unambiguously. Third, the conditions "might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs.'" *Id.* at 207, 107 S.Ct. at 2796 (citations omitted).

Just as plaintiff South Dakota could not seriously challenge the highway funding program, plaintiff CAPRA cannot dispute that child support regulations likewise pass constitutional muster under the three criteria. As another district court has observed, "[l]egislative regulation of AFDC expenditures is well within the constitutional Article I power of Congress." *Vermeulen v. Kheder*, 599 F.Supp. 1217 (W.D.Mich.1984) (*citing Walker v. Adams*, 741 F.2d 116, 119–20 (6th Cir.1984)).

First, child support regulations are within the "pursuit of the general welfare." Over the course of several decades, Congress has come to conclude that significant legislation is necessary to alleviate some of the effects of divorce upon children. The legislative history is replete with statistics showing that lack of adequate child support has become a serious problem. It affects almost one-quarter of all American children; more than three million of whose fathers do not live in the home and do not provide financial support for their upbringing.

Second, the federal requirement is clear. It is difficult to misunderstand that the federal government has declared a national policy concerning child support. The importance of the national policy is not lessened because the states have been given responsibilities in carrying it out. The state of Ohio understood that it was required to develop specific and numeric guidelines in this area.

Third, the federal grants of money are related to the federal interest in child support. The relationship between the AFDC program and child support is much closer than that between highway funding and drinking ages. Whether individuals are recipients of welfare, they benefit from the child support policies. Any differences between parents who support their children and parents who do not do so is irrelevant for purposes of Spending Clause analysis.

The general welfare requirement has been interpreted as foreclosing Congressional exercise of the spending power for purely local concerns. The legislative history surrounding the most recent amendments also shows that, in part, Congress was concerned that not every state had developed adequate child support regulations. Thus, the amendments and HHS interpretations extend to all states the re-

quirement of numeric guidelines with rebuttable presumption status.

### V. PLAINTIFF'S CLAIMS 9 AND 10

■ Plaintiff's claims that federal child support laws violate the Contract Clause of the Constitution and the prohibition against ex post facto laws border on the frivolous. These claims are not supported by case law and do not merit serious consideration.

### VI. PLAINTIFF'S CLAIM 11

■ CAPRA argues that the challenged statute constitutes an improper delegation of legislative authority to an administrative agency. CAPRA presents a related argument that HHS has drafted a regulation in conflict with that delegated authority. Both of these arguments must be rejected.

Courts have examined the problem of delegation on numerous occasions.

> In a passage now enshrined in our jurisprudence, Chief Justice Taft, writing for the Court, explained our approach ... "In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of government coordination."

*Mistretta,* 488 U.S. at 372, 109 S.Ct. at 654. Therefore, "[s]o long as Congress 'shall lay down by legislative act an intelligible principle to which [an agency] is directed to conform,' such legislative action is not a forbidden delegation of legislative power.'" *Id.*

In *Mistretta,* the Court upheld the creation of the United States Sentencing Commission, which create binding guidelines for all federal offenses. The instant case appears similar on the surface because it, too, involves guidelines. Yet the sentencing guidelines presented greater constitutional concerns than do the child support guidelines, not only because the former apply in a criminal context but also because the Sentencing Commission is not a traditional executive branch agency. Given that the sentencing guidelines did not involve unconstitutional delegation, *a fortiori,* the

child support guidelines survive scrutiny in this regard.

It is equally well-established that Congress in fact has delegated authority to the Secretary of HHS. Congress has authorized the Secretary of HHS to:

> make and publish such rules and regulations, not inconsistent with this Act, as may be necessary to the efficient administration of the functions with which [he] is charged [under the Social Security Act].

42 U.S.C. § 1302. This grant of statutory authority is buttressed by express requirements that HHS establish a separate child support enforcement unit. *See* 42 U.S.C. § 652. The director of that unit, the Office of Child Support Enforcement (OCSE), was given the responsibility of providing technical assistance to state child support programs. The responsibility went further, encompassing "establishing standards for state programs which he determines to be necessary to assure that such programs will be effective." *See* 1984 U.S.Code Cong. & Admin.News 2397, 2436; 42 U.S.C. § 652(a)(1). It is with this background of statutory authorization that HHS action must be evaluated.

Judicial review of agency interpretation of statutes begins with the question of whether Congress has spoken directly to the issue at hand. "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must given effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Where the Court determines that Congress has not spoken to the issue, as is often the case, it does not develop its own construction of the statute. Instead, where an agency has spoken to the issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. Thus, the question becomes whether the agency's answer is a reasonable one. *See id.; Young v. Community*

*Nutrition Institute,* 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986).

Here, the statute itself does not expressly endorse or disavow specific and numeric guidelines. It is through HHS interpretation that the requirement of guidelines is understood as referring to specific and numeric guidelines. HHS had earlier considered and rejected descriptive guidelines. *See* 50 Fed.Reg. 19643 (May 9, 1985). A review of the legislative history indicates that HHS was well within its authority in promulgating the regulation.

Plaintiff states in its motion for declaratory relief that, "succinctly put: CONGRESS NEVER INTENDED THAT CHILD SUPPORT GUIDELINES BE BASED UPON A SPECIFIC PREDETERMINED CHILD SUPPORT AMOUNT!" Plaintiff's Motion for Preliminary and Permanent Injunctions and Declaratory Judgments at 12 (emphasis in original). Despite Plaintiff's rhetorical flourish, it has not shown that its characterization of Congressional intent is correct. Plaintiff has not found either express or implied statements to that effect.

Plaintiff suggests that the general grant of authority under 42 U.S.C. § 1302 does not extend to the specific provisions of 42 U.S.C. § 667. Rather, plaintiff continues, the latter section limits HHS to providing only technical assistance. Nothing in the text of the statute limits § 1302. Plaintiff has not supported its reading of § 1302 as excluding § 667 and has not referred the Court to legislative history supporting its restrictive view.

To the contrary, Defendant has cited several instances in the legislative history supporting the view that Congress was not only aware of the use of specific and numeric guidelines but also approved of them. Although the Court is cognizant of the limits of legislative history, in the instant case, the legislative history supports Defendant far more than Plaintiff. For instance, as described *supra,* Congress followed the lead of states in requiring guidelines. Among the states already using guidelines were Wisconsin and Minnesota, both of which employed numerical formu-

las. *See Child Support Enforcement Program Reform Proposals: Hearings Before the Senate Committee on Finance,* 98th Cong., 2d Sess. 18, 102–104 (transcripts of testimony). In addition, to the extent that Plaintiff is concerned that child support obligations are greater under guidelines, Congress has already considered that possibility. Congress acknowledged that guidelines had led to "overall award levels [which] tend to be somewhat higher than where the amount of the order is entirely discretionary with each judge." 1984 U.S.Code Cong. & Admin.News 2397, 2436.

Plaintiff's claim that Congress intended to apply guidelines only to parents who had evaded their child support obligations is flatly contradicted by amendments to Title IV–D that twice emphasized its applicability to children receiving AFDC benefits as well as non-welfare families, discussed *supra.* Congress has not adopted Plaintiff's position that its membership should be held to a different standard than individuals whose children receive AFDC benefits. Given the relatively clear legislative decision that child support policies should apply to both groups, which is reflected in the current regulation, an HHS decision exempting Plaintiff's membership would be more problematic than its actual regulation.

Finally, the regulation at issue was initially promulgated in 1985. When Congress later amended the statute, it did not disapprove of the regulation but rather strengthened the rebuttable presumption element. This Congressional action suggests that HHS did not exceed its authority. The Court refrains from adopting Defendant's position that the HHS regulations might be the only reasonable interpretation. It is sufficient that the regulations are a reasonable interpretation.

## VII. PLAINTIFF'S CLAIM 12

As in an earlier challenge to child support laws, brought by Plaintiff's present counsel, the due process claims raised here "are the heart of plaintiff's argument." *Agg,* 855 F.2d at 342. *See also Fitzgerald,* 566 A.2d 719. Plaintiff's concerns that the

738

procedures for determining child support obligations place its membership in an unfair position are properly characterized as resting on due process grounds. It is ultimately due process requirements that govern the use of numeric guidelines, the rebuttable presumption accorded the results of such guidelines, and the classification of Plaintiff's membership with, in its words, "deadbeats."

Defendant has argued, *inter alia,* that the *Agg* decision is controlling authority in this case. However, the plaintiff in *Agg,* a divorced father, had stipulated to a child support arrangement with his ex-wife and the case itself concerned subsequent garnishment and contempt proceedings. *Agg,* 855 F.2d at 340, 343. While *Agg* is very persuasive, it does not determine the outcome of this case.

The parties also disagree over the significance of the *Fitzgerald* opinion. There, the Court of Appeals of the District of Columbia upheld the general federal requirement of numeric guidelines but struck down particular judicially-created guidelines. *Fitzgerald,* 566 A.2d 719. The Court noted though that "the party trying to argue against application of the Guideline faces a monumental obstacle in attempting to demonstrate a case is 'exceptional' without knowing what 'unexceptional' is." Therefore, the Court suggested that drafters of future guidelines take into consideration the changed burden of proof under a system using guidelines. *Id.* at 731.

Plaintiff's due process claims raise substantial questions of law. A hearing on these questions will facilitate their resolution.

### CONCLUSION

The Motions to Dismiss of Defendants ODHS and Judge Leskovyansky are GRANTED. The Motion for Summary Judgment of HHS and OCSE is GRANTED with respect to Plaintiff's claims 1–11. The Motion for Summary Judgment and motion for declaratory and injunctive relief filed by Plaintiff, with respect to claim 12 only, is HELD IN ABEYANCE pending a hearing. The Court will schedule such a hearing seasonably.

IT IS SO ORDERED.